DREW, J.
 

 11 Brande Stowe entered a Crosby
 
 [1]
 
 plea to possession of over 400 grams of cocaine in violation of La. R.S. 40:967(F)(l)(c), reserving her right to appeal the trial court’s denial of her motion to suppress evidence. We affirm.
 

 The evidence against defendant was seized during a traffic stop on 1-20 in Bienville Parish.
 

 At the hearing on the suppression motion, Louisiana State Police (“LSP”) Trooper Jason Parker testified that Stowe’s vehicle first came to his attention
 
 [2]
 
 when her vehicle passed the patrol unit and appeared to have no tags. The troopers began to follow the vehicle. As they approached the vehicle, the troopers saw that the license plate was indeed present.
 

 Both troopers observed the vehicle drift badly across the fog line and then across the line between the two eastbound lanes.
 

 Trooper Parker testified that:
 

 • he turned on his unit’s emergency lights to conduct a traffic stop, in response to which the vehicle’s right turn signal was activated and Stowe'pulled over;
 

 • he instructed the driver to meet him at the rear of the vehicle, at which point she shakily produced her driver’s license;
 

 • when asked for her registration, she went to the front passenger door;
 

 • he followed her and observed a male passenger in the vehicle “acting in a nervous manner” and having trouble sitting still in the car;
 

 • she found an insurance card in her glove box, but no registration;
 

 12* she admitted driving poorly, saying that she and her boyfriend were headed from Dallas to Florida and had been looking for a place to spend the night;
 

 • she told him that she had flown into Dallas to meet her boyfriend’s mother;
 

 • the male passenger was still sitting in the car, calling his “legal people”;
 

 • when asked for identification, the passenger produced a Florida I.D. card identifying him as Terrance Lawrence;
 

 • he told the trooper that Stowe was in the military, a fact she confirmed;
 

 • Parker ran driving and criminal histories on the two people, discovering that her records were clear but that Lawrence had a prior “Schedule II violation”;
 

 • Parker told her that because she had a clear driving record and because of her military status, he was just going to give her a verbal warning, at which point he returned all of her paperwork to her;
 

 • when he mentioned her flight to Dallas, she then said she had driven there;
 

 • finding the change in her story suspicious, he asked about her passenger and about the heavy amount of illegal drugs coming out of the Dallas area;
 

 
 *948
 
 • she appeared nervous, couldn’t be still, and was constantly moving;
 

 • when asked, she denied carrying anything illegal in the vehicle;
 

 • when asked if he could search the vehicle, she avoided the question;
 

 • he then advised her that the traffic stop was over and that he was conducting a different investigation because he felt that something was wrong;
 

 • he asked her again for consent to search the car, and again she declined;
 

 • he radioed for an LSP Canine Unit, which arrived three minutes later;
 

 • Parker had Lawrence exit the vehicle and patted him down for weapons;
 

 |3* Trooper Sears conducted a K-9 search resulting in an alert for narcotics;
 

 • Stowe was informed that she was not presently under arrest but her rights under
 
 Miranda
 

 [3]
 

 were explained to her;
 

 • a subsequent search of the vehicle yielded nine pounds of cocaine; and
 

 • Stowe and her passenger were both arrested.
 

 The state also introduced into evidence the dash cam video which documented the stop. Trooper Parker explained that the recording feature on the camera begins when the patrol unit’s lights are activated and that the recording rolls back to one minute prior to the activation. Accordingly, when the video portion of the incident begins, the patrol unit is still traveling down the Interstate some distance behind the suspect’s vehicle. Because the camera is largely out of focus, it is simply not possible to determine whether any traffic violation occurs during the recording.
 

 The video confirms Trooper Parker’s testimony as to the basic initial facts of the stop and subsequent investigation, with these clarifications:
 

 • Trooper Parker is unsuccessful in his first attempt to call out over the radio so he asks the defendant to move her vehicle up the road to the next mile marker;
 

 • After the vehicles move, he calls in the identities of the defendant and her passenger and waits approximately 10 minutes for a response;
 

 • When the response comes, Trooper Parker is heard repeating information being given to him over the phone that Lawrence has a Schedule II narcotics violation that had occurred on 1-10 in St. Martin Parish;
 

 • Trooper Parker then exits the patrol unit and asks the defendant to step out of her vehicle, advising her that her driving record is clean Land that he could find no record of a Florida ticket she admitted receiving;
 

 • He then inquires about her earlier assertions that she had flown into Dallas, at which point she says that she drove to Dallas;
 

 • Trooper Parker then tells her that he is just going to give her a warning due in part to her service in the military, though various indicators suggests that something is not right and asks her whether there is anything illegal in the vehicle;
 

 • When she denies that there is, Parker requests consent to search the vehicle;
 

 • She expresses skepticism over the necessity for a search since she was only stopped for “weaving”;
 

 • When asked again for consent, she declines, at which point the trooper calls in the refusal of consent over the radio and asks her to wait for a K-9 unit;
 

 
 *949
 
 • Three minutes later, a trooper and dog are seen walking around the vehicle and the dog is seen repeatedly raising up on his hind legs and placing his front paws on the trunk of the vehicle;
 

 • She is again asked about anything illegal in the vehicle, which she denies, at which point a manual search of her car reveals the bag of cocaine;
 

 • From the time the stop initiated until the defendant and her passenger are taken into custody, a total of approximately 36 minutes elapsed; and
 

 • About 10 of those minutes went by as the troopers waited for information from Troop F after calling in the identities of the defendant and her passenger.
 

 Lastly, the state introduced radio logs from Troops F and G, establishing the chronology of calls made by Trooper Parker in relation to the defendant’s stop:
 

 9:46 p.m. — Earliest indication of radio contact is on Troop G’s log, which Trooper Parker testified was when the stop was first called in, though he conceded that because he could not establish radio contact where the stop initially occurred, the stop had actually commenced around 9:40 p.m.
 

 [59:51 p.m. — -An entry on Troop F’s log reflects that Parker requested the criminal histories on the defendant and Lawrence.
 

 10:06 p.m. — The trooper called in defendant’s refusal to consent to a search. 10:08 p.m. — Troop F’s log reflects the arrival of the K-9 unit.
 

 10:16 p.m. — Troop F’s log indicates that Parker had made the arrests.
 

 Trooper Timothy Gray, who was riding with Trooper Parker at the time of the stop, testified only in relation to the circumstances leading to the initial stop. His testimony corroborates that of Trooper Parker. He indicated that when the vehicle passed them on the Interstate, they were unable to see a license plate on the vehicle. When they caught up to the vehicle and saw that it did in fact have a license plate, they entered the plate numbers in their computer and rode behind the defendant while they awaited the results. As they followed behind her vehicle, they witnessed a traffic violation when the defendant weaved over the solid line separating the traveled roadway and the shoulder of the road and then back over and across the dashed line separating the two eastbound lanes of travel, prompting the stop that eventually led to the defendant’s arrest.
 

 Defendant argues that since the dash cam video shows no weaving, there was no probable cause
 
 [4]
 
 for the stop. The court, having reviewed the video, found that it could not tell much about her driving, but noted that the defendant admitted to the weaving on the video after the stop. Accordingly, the trial court found that the stop, search, and seizure were legal, denying Stowe’s motion to suppress.
 

 | ^Defendant pled guilty pursuant to
 
 Crosby, supra,
 
 reserving the right to appeal the issues of whether the trial court erred in denying her motion to suppress. She was sentenced per a plea agreement to the minimum sentence for this crime: 15 years without benefits, and a $250,000 fine.
 

 DISCUSSION
 

 The defendant argues that (1) the initial stop of her vehicle by the state troopers was unlawful as evidenced by
 
 *950
 
 their inability to point out in the dash cam video exactly where the alleged violation(s) occurred; and (2) defendant’s shaking hand and her passenger’s mid-stop consultation with legal counsel did not create reasonable suspicion of criminal activity justifying further detention.
 

 The state argues the initial stop was lawful, given the observations of both officers as well as Stowe’s admissions as to her erratic driving, which established reasonable suspicion of criminal activity for the initial stop. As other suspicious events transpired, further detention was warranted.
 

 Our law on warrantless stops, searches, and seizures is well settled.
 
 [5]
 

 |7If a police officer observes a traffic infraction, the subsequent stop for that offense is clearly legal; the standard is a purely objective one that does not take into account the subjective beliefs or expectations of the detaining officer. This objective standard is indifferent to the relatively minor nature of a traffic violation.
 
 State v. Stoutes,
 
 43,181 (La.App.2d Cir.4/2/08), 980 So.2d 230. To assess the validity of an investigatory stop, the critical inquiry focuses on the officer’s knowledge at the time of the stop.
 
 State v. Williams,
 
 421 So.2d 874 (La.1982).
 

 La. C. Cr. P. art. 215.1(D) states that in conducting a traffic stop, “an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.” The statute also provides that “nothing herein shall prohibit a peace officer from compelling or instructing the motorist to comply with the administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950.”
 

 La. C. Cr. P. art. 215.1(D) does not preclude a trooper from conducting a routine driver’s license and registration check or from engaging in conversation with a driver and his passenger while he does so.
 
 See
 
 La. R.S. 32:404(A); La. R.S. 47:511(A);
 
 State v. Lopez,
 
 2000-0562 (La.10/30/00), 772 So.2d 90.
 

 If the police officer has a specific suspicion of criminal activity, he may further detain the individual or the property while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular ^suspicion.
 
 United States v. Sharpe,
 
 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
 

 There is no bright line rule for when a detention lasts too long. Each
 
 *951
 
 instance must be assessed in view of the surrounding circumstances.
 
 State v. Arrington,
 
 556 So.2d 263 (La.App. 2d Cir.1990).
 

 Stowe does not dispute her poor driving. She argues that the stop was unlawful because the video does not prove that any traffic violation occurred.
 

 A review of the dash cam video is unclear. Due to darkness, neither the center dashed dividing line nor the white fog line on either side of the defendant’s vehicle is visible in the video from the beginning of the recording until just before the patrol unit’s lights are activated. Furthermore, during the majority of that portion of the video, the defendant’s car is out of focus, making it difficult to determine either that she did or did not leave her lane of travel. As stated by the trial court, the video simply does not establish the existence or the absence of a violation.
 

 The trial court relied on the testimony of both Trooper Parker and Trooper Gray that as they proceeded behind the defendant’s vehicle, after detecting the license plate, they witnessed it veer to the right over the white fog line and then left over the dashed center dividing line. Defendant offered no evidence to contradict this testimony. Furthermore, the dash cam video indicates that when Trooper Parker informed her that she “had bobbled the white line and the dashed line,” the defendant does not dispute the assertion but instead confirms that she had been getting tired. Because |9this court reviews the district court’s ruling on a motion to suppress under the manifest error standard in regard to factual determinations, as well as credibility and weight determinations,
 
 [6]
 
 and because no evidence exists to contradict the officers’ assertions, the trial court was not in error to conclude that a lawful traffic violation had occurred.
 

 The issue regarding whether further detention was justified is whether or not additional reasonable suspicion of criminal activity developed after the stop, as per La. C. Cr. P. art. 215.1(D). This record supports the state’s position that it did.
 

 It is clear that the defendant’s shaking hands, her passenger’s call to his “legal people” at the outset of the stop, her conflicting accounts of how she had arrived in Dallas, and her passenger’s prior Schedule II violation on Louisiana’s Interstate system (all of which the dash cam video confirms before Trooper Parker ended the traffic stop portion of the detention), gave the troopers additional reasonable suspicion by which to justify enlarging the scope of their investigation.
 
 See State v. Lopez, supra; State v. Burton,
 
 93-828 (La.App. 3d Cir.2/23/94), 640 So.2d 342,
 
 writ denied,
 
 94-0617 (La.4/7/94), 641 So.2d 203.
 

 A K-9 unit arrived on the scene within three minutes of the defendant’s refusal of consent to a search. A dog’s sniffing around the exterior of the vehicle does not itself constitute a search.
 
 United States v. Place,
 
 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The certified dog’s subsequent alert, consistent with the other factors giving rise |into the troopers’ reasonable suspicion, gave the troopers probable cause to search for contraband.
 
 See State v. Lopez, supra.
 
 Approximately six to seven minutes elapsed from the time the traffic stop ended and the time the dog alerted to the presence of narcotics. Under these circumstances, the record fully supports the finding of the trial court that
 
 *952
 
 the troopers were diligent in pursuing an investigation that was likely to confirm or dispel their suspicions quickly. Neither the initial traffic stop, nor the narcotics-related extension of the stop, was unlawful. As no rights were violated, the motion to suppress was properly denied.
 

 DECREE
 

 The defendant’s conviction and sentence are AFFIRMED.
 

 [1]
 

 .
 
 State v. Crosby,
 
 338 So.2d 584 (La.1976).
 

 [2]
 

 . As well as to the attention of Trooper Timothy Gray, who was working with Parker.
 

 [3]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [4]
 

 . The burden for a stop is, in all cases, reasonable suspicion of criminal activity, not the more stringent burden of probable cause.
 

 [5]
 

 . The right of every person to be secure in his person, house, papers, and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is
 
 per se
 
 unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement.
 
 State v. Thompson,
 
 2002-0333 (La.4/9/03), 842 So.2d 330;
 
 State v. Ledford,
 
 40,318 (La.App.2d Cir. 10/28/05), 914 So.2d 1168.
 

 The purpose of limiting warrantless searches to certain recognized exceptions is to preserve the constitutional safeguards provided by a warrant, while accommodating the necessity of warrantless searches under special circumstances.
 
 Terry v. Ohio,
 
 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
 

 When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D);
 
 State v. Johnson,
 
 32,384 (La.App.2d Cir.9/22/99), 748 So.2d 31.
 

 [6]
 

 .
 
 State v. Hemphill,
 
 41,526 (La.App.2d Cir.11/17/06), 942 So.2d 1263,
 
 writ denied,
 
 2006-2976 (La.3/9/07), 949 So.2d 441.