DREW, J.
| ¡.Frederic Lubron Birgans appeals his conviction for the crime of possession of marijuana with intent to distribute. He further appeals his sentence of 17 years at hard labor. We affirm in all respects.
FACTS
On Saturday, January 31, 2009, around 1:30 a.m., defendant was driving a rental car from Dallas, Texas to Hillsboro, Alabama on 1-20 in Ouachita Parish. Trooper Michael Linton clocked defendant driving 70 miles per hour in a 60 mile per hour zone. The trooper followed defendant some distance, noticing some weaving •within his lane of traffic. The trooper chose not to stop defendant until he had crossed the Ouachita River because the portion of the interstate over the . river is elevated with no safe place to pull over. Once over the bridge, the trooper turned on his lights, and at that |smoment the camera in his vehicle was automatically activated. Linton initially forgot to activate his microphone, so there is no audio at this point.
*480 Defendant produced his license, rental agreement and insurance card, advising that his address on the license was wrong, but correct on the insurance card.
Defendant insisted he was not driving 70 mph. Linton thought defendant looked nervous and sounded as if he had “dry-mouth.” When asked about any prior traffic violations, he said he had paid off all except one, and that was the purpose of this trip to Alabama.[1] Defendant told the trooper that court was to be held on Tuesday and that he was going to Alabama early so he could watch the Super Bowl there. The trooper thought this to be odd. He asked defendant if he had a criminal record for drugs, which was first denied, then admitted without explanation.
When the trooper took defendant’s documents back to his unit, he realized he had not turned his microphone on. He turned it on and gave a short narrative of what had transpired during the stop to that point. The computer check revealed that the name on the car rental agreement and insurance card was that of defendant’s son, Brandon. As defendant was listed on neither document, he was not an authorized driver of the rental car, 14and the insurance card did not cover him. At this point, Officer Chris Ballard with the Monroe Police Department arrived to provide backup.
Linton ran a criminal background check and found defendant had been convicted of distributing marijuana several times in his past. The trooper prepared a written consent to search and got defendant to exit the car. Linton told defendant that he did not intend to give him a citation but continued to question him about the documents and the lack of a correct address. Defendant could not recall his home municipal number, further convincing the trooper of his nervousness. Defendant did not sign the written consent to search and became argumentative.
Linton called a K-9 unit, advising defendant that if the dog did not alert, he would be free to go. While waiting for the canine unit, defendant asked if he could get his jacket and cigarettes from the car. Linton opened the car’s back door and quickly retrieved the jacket, which contained the cigarettes in a pocket.
Seven minutes after the call, Trooper John Peters arrived on the scene with the dog, Andy. Peters asked Linton to turn off the engine of defendant’s car so that Andy could walk around the car safely. Linton did so. There was no search at this point.
|fiAndy and his handler walked around the car. The dog, according to his handler, subtly alerted to the driver’s side door.
The troopers:
• searched the car as a result of Andy’s alert;
• found in the trunk a black suitcase containing 11.5 pounds of vacuum-sealed packages of marijuana mixed with dryer sheets and a deodorizer ball;
• handcuffed and arrested defendant, and administered Miranda warnings;
• called Agent Shelton Z. Crooks to pick up the car and the marijuana;
• took defendant to State Police Headquarters; and
• booked defendant with two traffic tickets plus the felony drug charge.
The case was assigned to Judge Carl V. Sharp. A 72-hour hearing was held[2] and defendant was appointed counsel, Ms. Elizabeth Brown. On March 16, 2009, defen *481 dant was arraigned via video transmission. Another attorney from the Ouachita Parish Indigent Defender’s Office, Lee Perkins, appeared with defendant, waiving formal arraignment, and pleading him not guilty.
At least three times prior to and during trial, defendant insisted that he had never been arraigned. He claimed that nobody ever asked him how he pled. Each time defendant objected, the trial judge told him he had been |fiarraigned via video on March 16, 2009. Eventually the state offered a plea bargain whereby defendant would plead guilty and serve 10 years, and in exchange, the state would not charge him as a habitual offender. Defendant rejected that offer and countered with his own that he would serve five years and reserve the right to appeal a motion to suppress under State v. Crosby, 338 So.2d 584 (La.1976), but the state rejected that proposal.[3]
Counsel filed motions to suppress evidence on defendant’s behalf, each being denied. The motions related to:
• a challenge of the initial stop, because of no corroboration of bad driving;
• the missing audio on the first portion of the tape; and
• the trooper’s initial representation that he was not going to ticket defendant.
The trial began on February 1, 2010, and prior to opening argument, defendant asked the trial court to let him represent himself. The trial judge discouraged defendant from taking this action, but he eventually allowed him to do so with Ms. Brown acting as standby counsel. At trial he inexpertly[4] attempted to impeach the credibility of the witnesses.
The jury convicted defendant as charged. He filed a “Motion for Ineffective Assistance of Counsel,” which the trial court denied.[5] The court sentenced defendant to 17 years at hard labor, denying defendant’s oral |7motion to reconsider sentence. His appointed appellate lawyer raised three assignments of error; he raised seven in a pro se brief. We have combined some assignments in the interest of better organization and discussion.
DISCUSSION
I. Arraignment
By his first assignment of error and his fourth pro se assignment of error, defendant alleges that he was not properly arraigned. Even though counsel was appointed to represent him at the 72-hour hearing, he alleges that no attorney ever spoke to him or asked him if he wanted to waive formal arraignment or how he intended to plead. Instead, he complains that on March 16, 2009, at a video arraignment, a public defender waived formal arraignment and entered a plea of not guilty for him. Somehow he alleges that this violated his right to due process.
This issue is the reddest of all herrings. Perhaps the question to be asked is exactly what harm did defendant suffer? The answer is nothing.
A logical starting point may be a quick review of La. C. Cr. P. art. 552, which lists the only four possible pleas:
*482 • guilty,
• not guilty,
• not guilty and not guilty by reason of insanity, and
• nolo contendere.
IsWhich pleas would he have preferred? Nothing in the record indicates a desire on his part to plead guilty or nolo contende-re — -just the opposite. And defendant has made no claim to have been insane at the time of the offense. The argument is completely without substance.
The state argues that the video arraignment of defendant on March 16, 2009, was legal and properly conducted. The state points out that counsel, Ms. Brown, had been appointed to represent him at the 72-hour hearing. On the date of the hearing, the attorney who conducts the arraignments for the Indigent Defender Board, Mr. Perkins, appeared on his behalf for Ms. Brown. Therefore, there was an attorney present for defendant on that date. Defendant remained silent throughout the exchange and never objected to the attorney waiving formal arraignment or pleading not guilty. The trial court spoke directly to defendant by video and informed him of his right to choose a bench trial or a jury trial. If a defendant is silent at arraignment, the result is the entry of a not guilty plea. See La. C. Cr. P. art. 554. The trial judge clearly explained this to him on May 14, 2009. We fail to see any harm suffered by defendant on this issue. These assignments of error lack merit.
II. Fourth Amendment Issues

Lawfulness of the Traffic Stop and the Subsequent Search

|9By his second assignment of error, and three of his pro se assignments of error, defendant challenges the propriety of the stop, search and seizure, and for the sake of brevity will be addressed together.
Defendant alleges that:
• the initial stop lacked reasonable suspicion that criminal activity was afoot, as required by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);
• officers may rely on the totality of the circumstances, but they may not disregard facts which tend to dissipate the causes of suspicion;
• there must be some level of reasonableness in the circumstances to discern between simply a random stop, as opposed to one with a reasonable basis, under U.S. v. Rangel-Portillo, 586 F.3d 376 (5th Cir.2009);
• the speeding charge and the alleged lane misusage were simply ruses for the initial stop, and nothing that developed amounted to probable cause for a search;
• the law provides that the police are strictly limited as to how long a motorist can be detained for a motor vehicle violation, under La. C. Cr. P. art. 215.1(D), and that time is no longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent the development of reasonable suspicion of criminal activity;
• the trooper here held him for much longer than reasonably necessary to cite him for any violation, and in fact, depended on the drug dog to finally establish some reason for the stop and probable cause for the search;
• even then, the dog’s alert was so subtle that it was only through the dog’s handler’s subjective opinion that probable cause to search was created;
|in* the stop resulted from of an unlawful narcotic checkpoint[6] by the State Police;
*483 • the search was unwarranted because there was no probable cause deriving from any canine alert, because no canine alert actually occurred;
• the troopers first searched the trunk even though the drug dog allegedly alerted to the driver’s side door, if at all;
• no ticket was issued on 1-20; five hours later he was ticketed at Troop F; and
• his rights were violated twice when Trooper Linton broke the “legal threshold” of his car before the dog sniffed it.[7]
The state responds that:
• Trooper Linton clocked defendant with his radar gun as driving'70 mph in a 60-mph zone, at which point he pulled out of the median and followed, observing him weaving within his lane of traffic;
• Linton stopped him when it was safe to do so;
• the video began at the point Trooper Linton first turned on his flashing lights;
• the trial court found the trooper to be credible as to what had occurred prior to the beginning of the tape; ■
• there was probable cause[8] to stop defendant’s vehicle for speeding and improper lane usage;
• the Louisiana State Police do not perform drug checkpoints;
• many factors led the trooper to conclude that this was no simple traffic stop;[9]
In* defendant’s allegations that the trooper violated the requirements of La. C. Cr. P. art. 215.1(D) are unwarranted because it specifically states that the officer may detain the person for longer than necessary to issue a citation if the officer has reasonable suspicion to believe there was other criminal activity involved;
• when the trooper returned to his unit and found defendant’s documents to be lacking, he found out that defendant had been lying to him about previous arrests for drug trafficking, thereby developing the reasonable suspicion necessary to continue detaining him until the drug dog arrived; and
*484 • Trooper John Peters, the dog’s handler, testified that the dog did alert at least twice, providing an objective basis to search the car.
The standard for evaluating a challenge to a routine warrantless stop for violating traffic laws is well settled.[10]
In regard to the length of the detention, La. C. Cr. P. art. 215.1(D) specifically provides that while the officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation, absent reasonable suspicion of additional criminal activity, the officer may also compel or instruct the motorist to comply with the administrative or other legal requirements of Title 32 or Title 47 of the Louisiana Revised Statutes of 1950. Therefore, an officer is allowed to conduct a routine driver’s license and vehicle registration check and may engage in conversation with the driver and any passenger while doing so. State v. Lawrence, 45,061 (La.App. 2 Cir. 3/3/10), 32 So.3d 329, writ denied, 10-0615 (La.10/8/10), 46 So.3d 1265.
In Lawrence, the court was required to review a K-9 sniff which resulted in an arrest for possession of a large amount of cocaine. The court stated that a K-9 smelling the air around a vehicle is not a “search” within the meaning of the Fourth Amendment. Citing Maryland v. Dyson, 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999), the court held that once a K-9 alerts on the vehicle, the officers have probable cause to search the vehicle without first obtaining a warrant.
In Lawrence, the court found it of no consequence to the legal validity of the stop that the officer decided to refrain from ticketing the defendant for a traffic violation. The defendant appeared nervous- and exhibited suspicious behavior, and gave explanations of his travel plans that were inconsistent with those given to the officer by a passenger in the car. The court found the actions of the occupants provided ample reasonable suspicion that criminal activity was afoot. This reasonable suspicion justified extending the stop so that the officers could continue to investigate the matter more thoroughly. The court stated that in spite of defendant’s argument that the 30-minute stop was im-permissibly long, there exists no bright-line rule for determining the appropriate length of traffic stops.
| iaIn this case, Trooper Linton testified that he clocked defendant driving 70 mph in a 60-mph zone. He also testified that defendant’s car was weaving *485 within the lane of traffic in which he was driving. Therefore, his testimony furnished the necessary reasonable suspicion to believe that a traffic violation had been committed and the trooper had grounds for a lawful traffic stop during which he was permitted to check the information given by defendant regarding the license, registration, and insurance on the vehicle. The totality of the facts presented to Trooper Linton justified a further detention, on account of additional reasonable suspicion of ci’iminal activity that developed after the stop.
The trooper’s decision to call the dog justified the extension of the duration of the stop. The trooper had the right to investigate his suspicions further. The K-9 is allowed to sniff the exterior of the car because that is not a search. Once the K-9 alerted to the vehicle, and his handler was able to identify the alert, the troopers had probable cause to believe there were drugs inside the trunk. The fact that the dog alerted at the door of the car rather than the trunk is of no consequence. The handler of the dog, Trooper Peters, explained that although trunks in new cars are sealed extremely well, the odor of marijuana in the trunk can filter through the interior of the car and seep through the seams where the doors meet the car body. The traffic stop 114was legal and the marijuana was lawfully seized. All actions of the officers at the scene were objectively reasonable.[11] These assignments of error lack merit.
III. Jury Nullification
By this third assignment of error, defendant argues jury nullification is a recognized practice which allows the jury to disregard uncontradicted evidence and instructions by the trial court. State v. Divers, 38,524 (La.App.2d Cir.11/23/04), 889 So.2d 335, writ denied, 04-3186 (La.4/8/05), 899 So.2d 2, and cert, denied. He claims that jurisprudence has allowed jurors to return a lesser responsive verdict fully supported by the same evidence that would also demonstrate, beyond a reasonable doubt, that the charged crime occurred. State v. Porter, 93-1106 (La.7/5/94), 639 So.2d 1137.
He further argues that he assumed the role of self-representation in the case and sought to impeach the investigating officers by focusing on inconsistencies and issues related to the search. However, the trial court noted that the motion to suppress had. been denied several times and informed defendant many times that the path he was pursuing was a question of law that was not within the purview of the jury’s decision. Defendant argues that while the trial court was correct in holding that the jury does not decide issues of search and seizure, the court erred in restricting the defense | ^because the jury retained the power and authority to reject the state’s case, for any reason, including by finding that the search was illegal. Therefore, he claims his impeachment of police officers over issues related to the stop should have been permitted.
The trial court did not restrict defendant from asking appropriate questions of the witnesses. His problem lay in arguing his interpretation of the law with witnesses instead of asking questions. Any reasonable questions were unrestricted. The court did not err by illegally interfering with this attempt at jury nullification.[12]
*486 In State v. Chatman, 43,184 (La.App.2d Cir.4/30/08), 981 So.2d 260, the court concluded that the failure of a trial court to give a requested instruction regarding jury nullification did not constitute reversible error. The court concluded the failure to include the instruction was not a miscarriage of justice, it did not prejudice the substantial rights of defendant, and it did not violate a constitutional or statutory right.
Birgans attempted to impeach the testimony of the trooper and convince the jury that the fruits of the search were illegally obtained, thereby providing the jury with a method by which it could ignore uncontra-dicted evidence and instructions by the judge.[13]
| isThe trial court’s action in limiting defendant to questioning witnesses rather than arguing his case to them was not improper and did not deny defendant the right to the benefits of jury nullification. There was no miscarriage of justice. The trial court’s ruling did not prejudice the substantial rights of defendant, and did not violate a constitutional or statutory right. La. C. Cr. P. Article 921. These assignments of error lack merit.
IY. Plea bargain
By his fifth pro se assignment of error, defendant alleges that a plea bargain had been made and accepted whereby he would plead guilty to possession of marijuana with intent to distribute in exchange for a five-year sentence and a reservation to appeal the issue of the motion to suppress pursuant to Crosby, supra. He claims that on April 6, 2009, at a hearing at the Ouachita Correctional Center, his attorney approached him with a plea agreement and explained the state had offered a plea of 10 years. Defendant allegedly told her that was too extreme and she offered to see if she could get the state to lower the plea. She allegedly came back and told him the state had offered a five-year sentence. He claims he said that would be all right with him if it included the right to plead guilty under Crosby, supra. He claims they went into court and he was shocked that his attorney *487 had told the 117court he was willing to plead, but ADA Harkins was not willing to give him the Crosby plea. This is the basis for his argument that he was denied his right to plea bargain and invoke a Crosby plea.
Defendant further alleges that he alluded to the Crosby plea in his PSI interview and in a letter he had written to the trial judge regarding sentencing. In the letter he allegedly told Judge Ellender he had no intention of going to trial if the state or court had accepted the plea agreement of five years with a Crosby plea. He also alleges that both he and his former attorney alluded to the plea at sentencing, but each time it was mentioned, the transcription was bleeped out.
The state asserts that there is nothing in the record to indicate that anything defendant alleges ever took place. The state also claims that even if this court were to accept his story as true, the record is devoid of any discussions of a guilty plea under Crosby with Judge Sharp, the judge who first had the case. Further, the state claims the minutes of April 6, 2009, do not even indicate that defendant was in court that date. The record reflects that on May 14, 2009, Judge Sharp held a hearing on a bond reduction, and the issue of a plea bargain was brought up. ADA Har-kins, apropos of nothing, stated, “His plea offer is five years. Take it or leave it.” ADA Harkins then stated, “I sent a letter offering ... dated March 30th where I say I ishe could plead to ten years and I would not file a habitual bill.” Shortly thereafter, ADA Harkins said, “But I backed off of that.” On November 16, 2009, before Judge Sharp, the ADA indicated that an offer had been made, but it was rejected and withdrawn. Otherwise, this record is silent as to any plea bargain being reached.
Our law on evaluating plea bargains is well settled.[14]
In this case, there was never a meeting of the minds in regard to a plea bargain agreement. Instead, the state made defendant an offer, which he refused. He counteroffered, but the state did not accept it. It is within the discretion of the district attorney’s office to decide whether to offer a defendant a plea agreement. No such agreement was ever reached. This assignment of error lacks merit.
Y. Denial of compulsory process
By his sixth pro se assignment of error, defendant voices displeasure with the fact that he sought discovery of every radio transmission from any patrol cars dispatched to the scene of his arrest and any video that might be available. He claims he was denied the compulsory process to which he is entitled under due process. Further he argues that once it became known that what was previously thought to be a silent video actually had audio, the trial |mjudge should have granted him a continuance so that he could seek professional help in preparation of his defense.
*488 Defendant also requested training records of the drug dog, but was never provided with the training records or certifications of the dog or the handler.
The state argues that prior to defendant’s decision to represent himself at trial, his former attorney, Ms. Brown, discovered that the video had audio. She asked the court for a continuance of the trial and it was granted. She sought professional help in an effort to enhance the sound coming from the recording. Her expert concluded that it was clearly audible and no further enhancement could be had. Defendant did not seek another continuance. The state also argues that in regard to his complaint that he requested audio and video from other persons responding to the scene, all of the witnesses testified that they did not have any other audio or video; ie., no further production of audio or video was possible because it did not exist.
In regard to defendant’s complaint that the records pertaining to the drug dog and its handler were not provided to him, the state points out that the record is devoid of any such request for the records, and that when the defendant had Trooper Peters on the stand, he did not ask for the records to be produced—in essence, a waiver.
IgpThe issue regarding the need for a continuance after the discovery that the video contained audio is a non-issue. The trial court granted a continuance upon motion of defendant’s former attorney. No other motion for continuance was made. All involved law officers appeared at trial, subject to cross-examination. None had any audio or video to provide to defendant even had the information been subpoenaed. There was no substantive denial of compulsory process.
Birgans, representing himself, failed to properly request any records or documents that he believed were subject to discovery, ie., the training records of the K-9 and any certification the trooper and dog might have indicating their competency in their professional field. He had the trooper who handled the dog on the stand and was free to cross-examine him; therefore, he was not denied compulsory process with regard to the trooper and dog who conducted the search of his vehicle. This assignment of error lacks merit.
VI. Waiver of (allegedly) Unprepared Counsel
By his final pro se assignment of error, defendant contends that his waiver of counsel was not voluntary. He contends that he lost faith in his court-appointed attorney because of differences they had concerning the direction in which his defense was heading. He complains that he found her |21so incompetent that he felt he had to take over his own defense; therefore, he unwillingly, although perhaps intelligently, sought to represent himself. The trial court appointed Ms. Brown as his standby counsel, even though he did not want her. Now he claims his waiver of counsel was involuntary. The record belies this.
Our law on the right to counsel is well settled.[15]
*489 In this case, defendant knowingly and unequivocally waived his right to counsel. The trial court repeatedly warned him of the perils and pitfalls of self-representation. The subject was broached before and during trial. Defendant showed sophistication and intelligence in his decision to waive counsel. The trial court determined that he had represented himself in court before on a previous drug charge in another state. Because of his insistence on representing himself, the trial court allowed him the right to waive counsel, but insisted that Ms former attorney serve as standby counsel to answer any questions he might have about procedure. This was an appropriate and reasoned decision by the trial court, completely in accord with the fair administration of justice. This assignment of error lacks merit.
DECREE
Defendant’s conviction and sentence are AFFIRMED.

. This was allegedly a five-year-old ticket for having an inoperable headlight.

. See La. C. Cr. P. art. 230.1.

.The timing of this alleged plea bargain proposal, and in fact, whether it ever existed, is unclear. Defendant has raised an issue relating to the alleged agreement as an assignment of error. Therefore, it is mentioned, at this point in the facts because defendant said it happened then.

. Defendant tended to argue the law and ultimate issues to the witnesses, rather than ask factual questions.

. The court treated it as if it were- a “Motion for a New Trial.”

. An interesting claim, but no evidence was provided on this allegation.

. First to get his jacket and cigarettes; second to turn off the motor. Each entry and exit lasted about two seconds. Nothing was seized.

. A brief traffic stop can be made by an officer’s observation of merely reasonable suspicion of criminal activity. To justify the immediate issuance of a citation, the traffic stop would require the satisfaction of a higher burden: probable cause.

. These included: Birgans gave him several different home addresses, he was driving a rental car even though he was not an authorized driver, the rental agreement specifically excluded anyone from driving the car except authorized (named) additional drivers,, the lack of proof of liability insurance on the car, defendant’s story of where he was going and why he was going there seemed implausible, he lied to the trooper about his prior drug trafficking arrests and convictions, he was unable to give the trooper the car registration, and he appeared extremely nervous. Our jurisprudence recognizes that the training and experience of a law enforcement officer may arouse suspicions of criminal activity that would elude an untrained civilian. The totality of the officer’s observations are examined together, not in a vacuum, and the trooper's developing additional reasonable suspicion of criminal activity during the stop led to his right to continue to detain defendant briefly to dispel or confirm these suspicions and to conduct the canine search.

. Evaluation of traffic stops involves the two-step formulation articulated in Terry v. Ohio, supra; State v. Pena, 43,321 (La.App.2d Cir.7/30/08), 988 So.2d 841. The court must determine “whether the officer’s action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.” U.S. v. Shabazz, 993 F.2d 431 (5th Cir.1993), quoting Terry v. Ohio, supra.
For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal • activity, such as a traffic violation, occurred or is about to occur before stopping the vehicle. When determining whether an investigatory stop was justified by reasonable suspicion, a reviewing court must consider the totality of the circumstances, giving deference to the inferences and deductions of a trained police officer. State v. Huntley, 97-0965 (La.3/13/98), 708 So.2d 1048. The determination of reasonable suspicion for an investigatory stop, or probable cause for arrest, does not rest on the officer’s subjective-beliefs or attitudes, but turns on a completely objective evaluation of all the circumstances known to the officer at the time of the challenged action. State v. Lawrence, 45,061 (La.App. 2 Cir. 3/3/10), 32 So.3d 329, writ denied, 10-0615 (La.10/8/10), 46 So.3d 1265. Therefore, when an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable.

. Less than 31 minutes transpired from the moment of the stop until the commencement of the search.

. Amazingly, there is some authority that has found jury nullification to be a recognized practice allowing a jury to disregard uncon-tradicted evidence and instructions by the *486 judge. See 2 Wayne R. LaFave and Jerold H. Israel, Criminal Procedure § 21.1 (1984).

. The trial court patiently explained the law to defendant:
Sir, and we went over that a few times off the record — I mean out of the presence of the jury. I’ll do it again.... The court has ruled that that stop is admissible. That the fruits of the stop are admissible. It’s ruled that the statements made by you are admissible. That’s not what’s going to — that’s not properly before the jury. Whether the court was right or wrong in ruling on the admissibility that's a legal issue that a different court will resolve whether this court made the proper call, but it’s not a decision for the jury. The jury is here to make a factual finding. They're not here to determine whether or not — what the law is.
* * *
[Yjou have been charged with Possession of Marijuana with Intent to Distribute. There'll be — I gave you a copy of the proposed jury charge. It sets forth a definition of the statute. They’ve got to find — if they were going to find you guilty it’s beyond a reasonable doubt that you violated that statute. If they find you not guilty it's — they have every right to do that as well. But they're not going to decide whether or not there was probable cause to stop you, whether or not the evidence was properly admitted into this trial. Those are the decision that this court has already made. Whether you agree with those decisions or not you have every right to disagree with the decision, but the decision has already been made. So the juiy is not going to make a determination about whether there was probable cause to stop you.

. In State v. Roberts, 01-3030 (La.App. 1st Cir.6/21/02), 822 So.2d 156, writ denied, 02-2054 (La.3/14/03), 839 So.2d 31, the court discussed the legal relations between the state, the defendant, and a court in a plea agreement. The court cited State v. Lewis, 539 So.2d 1199 (La.1989), in which the supreme court stated it relied on contract principles to reach a decision in State v. Nall, 379 So.2d 731 (La.1980), reasoning that a plea bargain is a contract between the state and one accused of a crime. A longstanding rule of contract law is that consent of both parties is required for a valid contract. The contract is formed by the consent of the parties established through offer and acceptance. The offer and acceptance may be verbal unless the law prescribes a requirement of writing. Once there is an offer and acceptance, the agreement is subject to specific performance. Plea agreements are "constitutional contracts.” Roberts, supra.

. La. C. Cr. P. art. 511 concerns the right to counsel: "The accused in every instance has the right to defend himself and to have the assistance of counsel.” La. C. Cr. P. art. 513 concerns assignment of counsel in cases other than capital cases and provides that when a person is indigent, and the court finds the statement of indigency to be true, the court shall provide for counsel in accordance with the provisions of La. R.S. 15:145.
In State v. Franklin, 43,173 (La.App.2d Cir.9/17/08), 996 So.2d 387, writ denied, 08-2371 (La.5/22/09), 9 So.3d 138, this court stated that a defendant may elect to represent *489 himself if the choice is knowingly and intelligently made and the assertion of the right is clear and unequivocal. A trial court may not force a lawyer upon a defendant when the defendant insists he wants to conduct his own defense and voluntarily and intelligently elects to proceed without counsel; however, he must ask clearly and unequivocally to proceed pro se and make this request in a timely manner. The right to counsel and to counsel of one’s choice cannot be manipulated to. obstruct the orderly procedure of the courts or used to interfere with the fair administration of justice. Absent a justifiable basis, there is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications.