CARAWAY, J.
[ William Earl Burney, Jr., entered a Crosby[1] plea to one count of possession *1188 with intent to distribute 200 grams or more, but less than 400 grams, of cocaine. Burney was subsequently sentenced to 12 years’ imprisonment at hard labor, to be served consecutively with any other sentence he was obligated to serve. Burney appeals the denial of a motion to suppress evidence. We affirm.

Facts

On March 4, 2010, the state filed a bill of information charging Burney with one count of possession with intent to distribute 200 grams or more but less than 400 grams of cocaine, a Schedule II Controlled Dangerous Substance in violation of La. R.S. 40:967(A)(1), one count of conspiring to distribute a Controlled Dangerous Substance in violation of La. R.S. 40:979, and one count of possession of counterfeit money with the intent to deceive another person in violation of La. R.S. 14:72.2. The charges stemmed from evidence discovered in a warrantless search of the vehicle driven by Burney during a January 14, 2010, traffic stop on Interstate 20. Burney filed two motions to suppress the evidence and any statements he made on the grounds that his detention and the following warrantless search were in violation of his Fourth Amendment rights.
The state presented the testimony of Louisiana State Trooper Adam Holifield, who initiated the traffic stop, and James Walter McLamb II, a former Caddo Parish Sheriffs Office deputy assigned to the K-9 unit. 12Holifield testified that at approximately 7:54 a.m. on January 14, 2010, he was on active patrol traveling eastbound on Interstate 20 when he observed a red sports utility vehicle in front of him drift over the solid white fog line with its passenger side tires. The vehicle traveled in that manner for 75 to 100 feet before all its tires returned to the travel lane. As a result of the improper lane usage, Holifield testified that he initiated the stop at mile post 30.5.
Once the subject vehicle stopped, Holi-field directed the driver to the rear of the vehicle. The defendant exited the vehicle and presented a Mississippi driver’s license identifying him as “William Burney.” After being advised of the reason for the stop, Burney admitted that he had crossed onto the shoulder because he got nervous when he saw the officer’s vehicle behind him. Burney further explained that he was traveling to Jackson, Mississippi, to introduce his girlfriend, the passenger in the vehicle, to his mother. Burney also told Holifield that the vehicle had been rented by the passenger’s mother in the Houston area. Holifield testified that during this initial exchange, he observed Bur-ney’s carotid artery pulsating and beads of sweat forming on his forehead despite the 38 temperature. Holifield also stated that Burney kept repeating the officer’s questions before answering them, that his voice was cracking and he kept shifting from side-to-side. Holifield interpreted all of these to be signs of the defendant’s nervousness about the encounter.
Holifield then approached the passenger, Sunnie Dalai, who was still seated in the vehicle. Dalai produced a Texas driver’s license and identified | ¡¡herself as Bur-ney’s girlfriend. She said that they were traveling from Houston to Vicksburg, Mississippi, to visit some friends. During the interview, Holifield indicated that Dalai avoided making eye contact, rapidly played with her hands and shifted her feet back and forth on the floorboard. When Holi-field asked Dalai about the strong air freshener smell emanating from the vehicle, Dalai told him that it was a liquid air freshener made by a friend which could “cover up just about anything.”
Given all these circumstances, Holifield decided to run a criminal history check on both individuals as he checked on the status of Burney’s driver’s license. The *1189 check revealed that Dalai had no prior criminal history but that Burney had arrests for possession of controlled dangerous substances in 2003 and 2009.
Having concluded that there was a “strong probability that some type of criminal activity was afoot,” Holifield called for backup before asking Burney for permission to search the vehicle. The defendant refused permission, so Holifield informed him that he was going to request a K-9 to conduct an open air sniff of the exterior of the vehicle. Holifield was subsequently joined by Trooper Dowden. Knowing that “their” K-9, Reko, was in training in Baton Rouge, Holifield asked the dispatcher to check Bossier City and Bossier Parish for K-9 unit availability. When none were available, Dowden contacted Deputy McLamb with the Caddo Parish Sheriffs Office who indicated that he could be on the scene in approximately 25 minutes. Dalai then indicated to the officers that as it was her mother who had rented the vehicle, she was willing to give consent to a Lsearch. Having already been refused consent by the defendant, Holifield decided to wait for the K-9 unit.
While they waited, Burney and Dalai sat in the back of Holifield’s patrol unit with a blanket and water which they had retrieved from their SUV. They were not handcuffed and the patrol unit’s door remained open. According to Holifield, McLamb arrived approximately 30 minutes after being called by Dowden. McLamb explained to Burney and Dalai why he had been called to the scene and that his dog, Diesel, would be conducting an open air search around the exterior of the vehicle. According to Holifield, at this point both subjects admitted to McLamb that they had smoked marijuana in the vehicle between Houston and their present location.
During the open air search, McLamb testified that Diesel showed a positive response to the presence of narcotics. Holi-field and McLamb both testified that when the subjects were informed of the positive response, Dalai asked whether the dog was alerting “just” to the presence of marijuana. Holifield and McLamb testified that they then conducted a search of the interi- or of the vehicle which revealed “gleanings” of a vegetable material consistent with marijuana on the floorboard of the vehicle. Inside the zipper compartment of a duffel bag, Holifield discovered what appeared be $2,680.00 in cash rolled up in a man’s white sock. The currency was subsequently determined to be counterfeit.
McLamb conducted the search of the rear cargo area where he found a shopping bag containing a small heart-shaped pillow and two candles, one 15white and one orange. Upon removing the candles from the bag, McLamb noticed the label on the bottom of the white candle was rolled up, revealing a dirt-like substance beneath it melted into the wax. Both officers testified that in their training and experience, drug couriers used all forms of “containers” to transport drugs, including hollowed-out candles. Accordingly, McLamb used a pocket knife to scrape the bottom of the candle and discovered that the dirt-like substance was in fact coffee grounds. Knowing coffee grounds were often used in an effort to mask the odor of narcotics, McLamb cut deeper into the candle where he found a white powdery substance wrapped in aluminum foil. The substance was subsequently determined to be 263 grams of cocaine.
As to the timing of the events, Holifield testified that the initial stop of the defendant’s vehicle took place at 7:54 a.m. He stated that McLamb was called to the scene at approximately 8:20 a.m. and arrived between 25 and 30 minutes later. The dashcam video of the traffic stop was also introduced into evidence. It depicts *1190 the subject vehicle as it begins to pull over on the side of the Interstate and the initial contact between Holifield, Burney and Da-lai. While none of the audible audio recording contradicts Holifield’s testimony as to his exchanges with the subjects, the passing traffic makes it hard to make out everything that is said. Holifield then returns to his unit where he can be heard calling in the subjects’ identifications for a criminal check.
Because the video does not bear a time stamp, all that can be determined is the time elapsed from when the recording begins. The | (¡information on the defendant’s prior arrests is not returned until approximately 21 minutes into the recording. Two minutes later, the defendant can be heard refusing consent to search the vehicle. Holifield and another officer, presumably Dowden, can then be heard trying to track down an available K-9 unit until approximately 28 minutes into the recording. At this point it appears the audio is silent until about one hour and five minutes into the recording when approximately one minute of audio can be heard and is then silent again until the subjects are alerted about the K-9 unit’s positive response. The drug dog is first seen on the recording at approximately one hour and ten minutes into the video as he is led by a deputy in an open-air search of the exteri- or of the vehicle. The officers can then be seen conducting a search of the vehicle during which they discover the narcotics-filled candles.
After hearing the testimony, the court took the matter under advisement to view the recording of the traffic stop and to allow the parties time to file memoranda. On December 7, 2010, the court denied both of defendant’s motions to suppress.
On March 25, 2011, defendant entered a Crosby plea to the charge of possession with intent to distribute 200 grams or more but less than 400 grams of cocaine in which he reserved his right to appeal the denial of his motions to suppress evidence. In exchange, the state agreed to dismiss all other charges pending against Burney. On June 28,- 2011, Burney was sentenced to 12 years at hard labor, consecutive with any other sentence he is obligated to serve. The instant appeal followed.
1 gDiscussion
In his first argument, Burney contends that the circumstances confronted by Holi-field during the traffic stop did not support a conclusion that there was a reasonable probability that criminal activity was involved so as to justify a 70-minute detention of Burney prior to the free-air dog sniff. Burney argues that the inconsistencies in his and Dalai’s stories were alone insufficient to justify the length of the detention and that the otherwise suspicious conduct of the two was nothing more than “typical reactions” to a stressful situation or cold weather. Burney also contends that for 43 of the 70 minutes that he was illegally detained, Holifield was doing nothing to further his investigation.
When the constitutionality of a warrant-less search and seizure is placed at issue by a motion to suppress the evidence, the State bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D); State v. Lee, 46,742 (La.App.2d Cir.12/14/11), 79 So.3d 1278.
The right of every person to be secure in his person, house, papers and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and by Article I, § 5, of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified under *1191 one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson, 02-0333 (La.4/9/03), 842 So.2d 330; State v. Tatum, 466 So.2d 29 (La.1985); State v. Lee, supra.
The purpose of limiting warrantless searches to certain recognized exceptions is to preserve the constitutional safeguards provided by a warrant, while accommodating the necessity of warrantless searches under special circumstances. Donovan v. Dewey, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Lee, supra.
The authority and limits of the Fourth Amendment apply to investigative stops of vehicles. United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment. State v. Lee, supra; State v. Birgans, 45,982 (La.App.2d Cir.1/26/11), 57 So.3d 478, writ denied, 10-2561 (La.11/4/11), 75 So.3d 917; State v. Khalfani, 43,647 (La.App.2d Cir.10/29/08), 998 So.2d 756, writ denied, 09-0267 (La.11/6/09), 21 So.3d 305.
The standard for evaluating a challenge to a routine warrantless stop for violating traffic laws is the two-step formulation articulated in Terry v. Ohio, supra; State v. Lee, supra; State v. Khalfani, supra; State v. Pena, 43,321 (La.App.2d Cir.7/30/08), 988 So.2d 841. The court must determine whether the officer’s action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. Terry v. Ohio, supra.
InFor a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur. State v. Lee, supra; State v. Bir-gans, supra; State v. Pena, supra. When determining whether an investigatory stop was justified by reasonable suspicion, a reviewing court must consider the totality of the circumstances, giving deference to the inferences and deductions of a trained police officer. State v. Huntley, 97-0965 (La.3/13/98), 708 So.2d 1048; State v. Lee, supra. The determination of reasonable suspicion for an investigatory stop, or probable cause for arrest, does not rest on the officer’s subjective beliefs or attitudes, but turns on a completely objective evaluation of all the circumstances known to the officer at the time of the challenged action. State v. Landry, 98-0188 (La.1/20/99), 729 So.2d 1019; State v. Pena, supra; State v. Arnold, 34,194 (La.App.2d Cir.12/6/00), 779 So.2d 840. Therefore, when an officer observes what he objectively believes is a traffic offense, the decision to stop the vehicle is reasonable. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The objective standard is indifferent to the relatively minor nature of a traffic violation. State v. Lee, supra; State v. Stowe, 44,815 (La.App.2d Cir.10/28/09), 25 So.3d 945.
In stopping a vehicle on reasonable suspicion, an officer has the right to conduct a routine license and registration check and may engage in conversation with the driver and any passenger while doing so. State v. Lopez, 00-0562 (La.10/30/00), 772 So.2d 90; State v. Lee, supra.
La. C. Cr. P. art. 215.1(D) states that, in conducting a traffic stop, “an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigátion of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.”
*1192 Thus, if a police officer has a specific suspicion of criminal activity, he may further detain the individual or the property while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular suspicion. State v. Lee, supra; State v. Stowe, supra. In order to further detain a suspect, however, the officer must have articulable facts giving rise to a reasonable suspicion of some separate illegal activity that would justify further detention of the suspect. State v. Kalie, 96-2650 (La.9/19/97), 699 So.2d 879; State v. Lee, supra. In making that determination, the totality of the circumstances must be taken into account. State v. Kalie, supra; State v. Lee, supra. The circumstances must be judged by an objective standard such that the facts available to the officer at the moment of seizure or the search would warrant a man of reasonable caution in the belief that the action taken was appropriate. State v. Kalie, supra; State v. Lee, supra. There is no bright line rule for when a detention lasts too long and each instance must be assessed in view of the surrounding circumstances. State v. Arnold, supra. Factors which may give rise to reasonable suspicion include the demeanor of the suspect and unlikely and inconsistent accounts regarding travels. State v. Miller, 00-1657 (La.10/26/01), 798 So.2d 947; State v. Kalie, supra; State v. Lee, supra; State v. Birgans, supra. The presence of an air freshener in a vehicle has also been considered a factor which may give rise to reasonable suspicion. State v. Lee, supra; State v. Thompson, 543 So.2d 1077 (La.App. 2d Cir.1989), writ denied, 551 So.2d 1335 (La.1989). Outstanding warrants and criminal records may also be considered in this inquiry. State v. Lee, supra; State v. Khalfani, supra; State v. Pena, supra.
The lawfulness of the initial stop in the case sub judice has not been challenged by defendant. Nevertheless, crossing the fog line onto the shoulder and out of one’s lane of travel has repeatedly been recognized as a lawful reason for a traffic stop. See State v. Miller, supra; State v. Stowe, supra. Trooper Holifield, therefore, had grounds for a lawful traffic stop during which he was permitted to converse with and check the licenses of both the driver and passenger.
The inconsistencies in Burney’s and Dalai’s explanations regarding their travels, obvious nervousness, strong odor of air freshener and Burney’s criminal record, all allowed a permissible shift in Holi-field’s focus sufficient to create a reasonable suspicion that criminal activity was afoot. This reasonable suspicion justified extending the stop so that Holifield could continue to investigate the matter more thoroughly.
After detaining the occupants of the vehicle, and receiving no consent to search the vehicle, the officer diligently pursued a means to investigate by calling for a K-9 unit that would likely dispel or confirm his suspicions. The trooper’s decision to call for the dog justified the extension of the duration of the stop. State v. Lee, supra; State v. Birgans, supra. The |12record shows that the officers had some difficulty in locating a drug dog, which legitimately delayed the search. Holifield testified, and the recording of the stop confirms, that once consent to search was refused, a search for an available K-9 unit commenced immediately. Once secured, however, an additional 30 to 40 minutes elapsed before the unit arrived due in part to the fact that the only available unit was from the Caddo Parish Sheriffs Office.[2] *1193 There is no suggestion that the delay was the result of any lack of diligence on the part of the investigating officers. While defendant complains that there was an approximate 43-minute span when Holifield was not investigating or doing anything to further the investigation, this time elapsed between the refusal of consent and arrival of the K-9 unit. Having been refused consent and not yet' having probable cause to conduct a warrantless search, Holifield acted as diligently in pursuing a means of investigation as the circumstances allowed. This assignment is therefore without merit.
Burney next relies on the plain view doctrine to argue that the officers did not have probable cause to dig into the candles solely on the basis that one of the candles appeared dirty.
Once a K-9 alerts on the vehicle, the officers have probable cause to search the vehicle without first obtaining a warrant. Maryland v. Dyson, 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999); United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); State v. Lopez, supra; State v. Kalie, supra. Police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained. California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). Whether certain containers fall within the scope of that search is not determined by the nature of the container, but rather by the object of the search and the places in which there is probable cause to believe it may be found. United States v. Ross, supra. Probable cause means “a fair probability that contraband or evidence of a crime will be found.” Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); State v. Thompson, supra. It must be judged by the probabilities and practical considerations of everyday life on which average people, and particularly average police officers, can be expected to act. State v. Thompson, supra; State v. Fisher, 97-1133 (La.9/9/98), 720 So.2d 1179.
Burney’s reliance on the plain view doctrine is misplaced. Rather, the crucial inquiry is whether the officers had probable cause to believe that narcotics, the object of their search, could be found in the candles. The evidence at trial demonstrated that a K-9 had alerted on the vehicle and that when the subjects were informed of the alert, Dalai’s response suggested to the officers the presence of some contraband other than marijuana. These facts, coupled with the discovery of marijuana gleanings and a substantial amount of money, legitimately raised a fair probability in the minds of the officers that more contraband or evidence of a crime would be found. This | ^justified their continued search of the vehicle and its contents. It was within the body of the vehicle that McLamb legitimately came across an open shopping bag containing two candles which appeared to have been tampered with. From their experience, both officers knew that drugs were sometimes carried in candles. This knowledge and the discovery of a foreign substance melted into the bottom of the candle raised adequate suspicion of the presence of drugs in the minds of the officers and justified additional investigation of the candle. For these reasons, Burney’s argument that the mere discovery of a dirty candle was insufficient to *1194 justify any further intrusive search of the candle is without merit.

Decree

For the foregoing reasons, Burney’s conviction and sentence are affirmed.
AFFIRMED.

. The guilty plea, made in accordance with State v. Crosby, 338 So.2d 584 (La.1976), reserved Burney's right to appeal the denial of a motion to suppress the cocaine seized.

. While defendant correctly points to the fact that consent was refused at the 23 minute mark and the drug dog did not appear in the video until the one hour and ten minute mark, it is also noteworthy that it was not until the *1193 28 minute mark that an available K-9 unit was located. The dog’s appearance in the video may not accurately reflect the time of the unit's arrival on the scene. McLamb explained that he initially approached the subjects to explain why he had been called and the procedure involved in the open air dog sniff and the record is silent as to the amount of time that elapsed during this encounter.