Judgment rendered July 22, 2020.

No. 53,413-KA

ON REHEARING

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                    Appellee

versus

BRANDON BELL-BRAYBOY                    Appellant

* * * * *

On Rehearing
Originally Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 93273

Honorable Michael O. Craig, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

J. SCHUYLER MARVIN                   Counsel for Appellee
District Attorney

HUGO HOLLAND
JOHN M. LAWRENCE
Assistant District Attorneys

* * * * *

Before GARRETT, STONE, COX, STEPHENS, and McCALLUM, JJ.

STONE, J., dissents for the reasons set forth in the original opinion, and for
the reasons set forth in the STEPHENS, J. dissent.
STEPHENS, J., dissents with written reasons.

**GARRETT, J.**

We granted rehearing to consider whether the detention of the defendant, Brandon Bell-Brayboy, following a legal traffic stop was constitutionally permissible. The defendant entered guilty pleas to one count of possession with intent to distribute more than 400 grams of cocaine and one count of possession with intent to distribute heroin, reserving his right to contest the denial of a motion to suppress, pursuant to *State v. Crosby*.[1] The sentences were agreed upon and the defendant was ordered to serve 15 years at hard labor for the cocaine charge and 15 years at hard labor without benefit of parole, probation, or suspension of sentence for the heroin charge. The sentences were ordered to be served concurrently. On appeal, Bell-Brayboy contends that the trial court erred in denying his motion to suppress the evidence against him. On original hearing, two judges determined that the trial court ruling denying the motion to suppress should be reversed. The third judge disagreed and issued a written dissent. The state filed an application for rehearing, which was granted. The matter was reargued before a five-judge panel. For the reasons set forth in the original dissent and for all of the reasons given below, on rehearing we affirm the trial court judgment.

## FACTS

Because a complete recitation of the facts is required to resolve the issues presented, we deem it necessary to set forth a thorough statement of the facts and evidence that were adduced below. On the evening of Tuesday, February 21, 2017, Louisiana State Police Trooper George

---

[1] *State v. Crosby*, 338 So. 2d 584 (La. 1976).

Strickland, III, was patrolling I-20 in Webster Parish, along with Troopers Matthew Titus and Brent Peart, who were in separate vehicles. They were part of a team that patrolled I-20 looking for traveling criminal activity such as drug and human trafficking.

Shortly after 8:00 p.m., Trooper Strickland saw a 2005 Toyota Solara automobile with a Georgia license plate traveling eastbound at the speed limit of 70 mph. The vehicle was being driven by Bell-Brayboy. When he saw Trooper Strickland, Bell-Brayboy slowed the vehicle to 65 mph. This action caught Trooper Strickland's attention and he began to follow the vehicle. He observed Bell-Brayboy pass two or three commercial vehicles and then pull back into the right lane. In doing so, he crossed the white fog line on the right side of the road, which is a violation of La. R.S. 32:79.[2] Trooper Strickland stopped Bell-Brayboy for the traffic violation.

During the course of the traffic stop, facts emerged which gave Trooper Strickland reasonable suspicion to believe that Bell-Brayboy was engaged in drug trafficking. These facts will be more thoroughly discussed below. Bell-Brayboy refused to give consent to search the vehicle and a K-9 unit was called. Within 20 to 22 minutes after receiving the call, the K-9 unit arrived. A drug dog performed an open-air search around the vehicle and alerted on both rear quarter panels. A search of the vehicle was

---

[2] La. R.S. 32:79 provides, in part:

   Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules, in addition to all others consistent herewith, shall apply.

   (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.

conducted. Ten kilograms of cocaine and one kilogram of heroin were recovered from the vehicle. Bell-Brayboy was arrested.

Following his arrest, Bell-Brayboy waived his right to remain silent and agreed to talk with the officers. He was questioned by Trooper O.H. "Hank" Haynes, IV, who was assigned to the Drug Enforcement Agency ("DEA") Task Force. Bell-Brayboy stated that he was being paid to drive the vehicle from Houston to Atlanta, Georgia. He did not know what was in the vehicle, but he knew that it was illegal. Bell-Brayboy turned his cellphone and passcode over to the officers. He allowed the officers to examine his cellphone, which contained numerous missed calls from someone Bell-Brayboy knew only as "Pop," the individual responsible for the drugs. Bell-Brayboy also agreed to try to call Pop, but his efforts were unsuccessful. He said Pop flew him from Atlanta to Houston, where he was picked up by an unknown male who transported him to a motel. There he obtained the keys to the Toyota from valet parking. He immediately began driving the vehicle back to Atlanta. When he reached Atlanta, Bell-Brayboy was to call Pop, who would tell him where to park the vehicle and Bell-Brayboy would get his own ride back to his personal car, which he left at the Atlanta airport. Bell-Brayboy was willing to attempt a controlled delivery of the drugs with the help of agents in Atlanta, but the officers could not get enough information to attempt the controlled delivery.

Bell-Brayboy was originally charged in federal court with conspiracy to possess with intent to distribute cocaine and heroin. A motion to suppress was filed claiming that Trooper Strickland stopped Bell-Brayboy's car without probable cause to believe that a traffic offense had been committed and that the officer unconstitutionally extended the traffic stop without

reasonable suspicion until a drug-sniffing K-9 could be brought to the scene. Bell-Brayboy argued that the search of the car violated the Fourth Amendment, so that all of the evidence found and incriminating statements made afterward should be suppressed.

A hearing was held on the motion before a federal magistrate judge on July 19, 2017. Trooper Strickland testified at the hearing. He briefly set forth his law enforcement experience. He detailed the initial observation of the defendant's vehicle and the traffic violation which resulted in the stop. When the stop was initiated, the dash-camera on his vehicle was activated.

Trooper Strickland ran a check on the vehicle's Georgia license plate and determined that the vehicle was not stolen, but was registered to a woman in Georgia. Bell-Brayboy said that the vehicle belonged to his sister. However, Trooper Strickland never asked for her name. The officer took Bell-Brayboy's Georgia driver's license and asked if he was sleepy. Bell-Brayboy said that he was "fine." Trooper Strickland noted that the interior of the car was very clean, with no personal effects of the driver or the owner. There was only a University of Alabama backpack in the back seat. Bell-Brayboy said that he played football for the University of Alabama and had been in Houston since Friday attending a training session. He said he was heading back to school in Tuscaloosa, Alabama. Trooper Strickland found it odd that Bell-Brayboy did not have more luggage for a four- or five-day trip.

During the initial portion of his encounter with Trooper Strickland, Bell-Brayboy was holding his cellphone, staring at a blank screen. The phone rang and Bell-Brayboy tried to answer. Trooper Strickland noted that only a phone number appeared on the screen and not a name. The officer asked Bell-Brayboy to put the phone down. Bell-Brayboy said he was

4

letting a "friend" know where he was located. Trooper Strickland thought Bell-Brayboy was deceptive in his answers and was engaged in some type of criminal activity.

Trooper Strickland returned to his vehicle to investigate further. He checked Bell-Brayboy's criminal history, finding an arrest for assault in Houston. Trooper Strickland also checked the player roster for the current year at the University of Alabama and did not find Bell-Brayboy's name. He did find his name on a roster that was several years old, possibly on a spring team.

Trooper Strickland determined that he was going to ask Bell-Brayboy for consent to search the vehicle, and he called Troopers Peart and Titus for backup before he did so. When the officers arrived, Bell-Brayboy refused to consent to a search. Officer Clint Smith with the Minden Police Department K-9 unit was contacted. The State Police K-9 unit was not available that night. The officers had previously arranged with Officer Smith to fill in if needed. Officer Smith arrived within 20 to 22 minutes. The drug dog performed an open-air search and alerted on both rear quarter panels of the car. A search revealed two aftermarket compartments in the natural voids of the vehicle. The officers could see contraband and packages wrapped in duct tape inside the compartments. The compartments had electronic devices that could not be readily opened. Bell-Brayboy was arrested and the vehicle was moved to the Minden Police Department, which was a safer location to continue the search. The officers found ten packages, wrapped in duct tape, each containing one kilogram of cocaine. They also found a package containing one kilogram of heroin.

5

On cross-examination, Trooper Strickland said that the stop occurred on a Tuesday night after a three-day weekend for President's Day. Trooper Strickland said that the amount of luggage Bell-Brayboy had did not match the length of his trip. He saw only a backpack and a bag of snacks. Trooper Strickland did not think the backpack would have held enough clothes for a five-day trip. However, the officer never asked if there was luggage in the trunk.

In addition to checking Bell-Brayboy's driver's license and registration, Trooper Strickland ran a criminal history and checked the Automated License Plate Recognition ("ALPR") system, which showed that the vehicle was observed traveling westbound into Texas on I-10 in Lake Charles, Louisiana, on Monday, the day before the stop. Trooper Strickland was asked by defense counsel if he had a "gut feeling" that things were not right with Bell-Brayboy's story. Trooper Strickland replied, "Well you say 'a gut feeling.' I call it 'reasonable suspicion.'"

According to Trooper Strickland, based upon his experience and training, he knew that something was not "adding up." This impression was based upon the facts that Bell-Brayboy did not appear on the University of Alabama player roster; he was not driving his own car; he was on I-20, which was not the shortest route from Houston to Tuscaloosa; the car was seen traveling westbound from Lake Charles the day before; and Bell-Brayboy refused to give consent to search the vehicle. Trooper Strickland said, "At that point, I really felt like it was narcotics but I couldn't say for sure." Trooper Strickland thought that someone was traveling with Bell-Brayboy in another car and that would explain the phone call. Trooper Strickland said that the K-9 unit arrived at the scene within 20 to 22 minutes.

While waiting for the K-9 unit, Bell-Brayboy was very talkative. According to Trooper Strickland, the defendant did not seem nervous at that point.

In addition to the testimony of Trooper Strickland, Trooper Haynes testified at the hearing about the statement made by Bell-Brayboy after his arrest. The dash-camera video of the stop was introduced into evidence and was viewed by the magistrate judge.

The dash-camera video shows that 20 seconds after the officer initiated the stop, Bell-Brayboy pulled over. Trooper Strickland engaged Bell-Brayboy in conversation, which is initially difficult to hear because the defendant was still in his vehicle and there was a lot of noise from the highway. Bell-Brayboy said that he had been in Houston since Friday. Two minutes and three seconds into the stop, Bell-Brayboy's cellphone rang and Trooper Strickland asked him to put it down and continue their conversation. Trooper Strickland asked Bell-Brayboy where he stayed in Houston. Bell-Brayboy replied that he stayed with his trainer, and asked whether the trooper believed his story. Bell-Brayboy said that he played football for the University of Alabama. Three minutes and 20 seconds into the stop, Trooper Strickland returned to his vehicle and began investigating Bell-Brayboy's story. At one point, Trooper Strickland is heard talking to another officer, telling him that Bell-Brayboy was pretty nervous. Trooper Strickland related Bell-Brayboy's story that he played football for Alabama and that he claimed he stayed with his trainer while in Houston. Trooper Strickland said that he could not find Bell-Brayboy on the player roster. He related that Bell-Brayboy claimed that he was using his sister's car and Trooper Strickland noted that the only luggage in the vehicle was a University of Alabama backpack. Trooper Strickland told the other officer

7

that it did not make any sense and the officer agreed. Trooper Strickland stated that Bell-Brayboy was getting pretty choked up when he was questioned. Trooper Strickland then returned to Bell-Brayboy's vehicle and asked him to get out. Trooper Strickland asked for permission to search the vehicle and Bell-Brayboy refused. He was told that the officer would call for a K-9 unit.

Other officers can be seen and heard on the video engaged in small talk about football with Bell-Brayboy. At 15 minutes and 44 seconds into the stop, an officer is heard to say that the K-9 unit is on the way. At 32 minutes and 31 seconds into the stop, the drug dog begins his open-air sniff. At 36 minutes into the stop, the dog alerted on the vehicle. The video shows that the traffic portion of the encounter took 14 minutes and the criminal portion took 22 minutes, for a total of 36 minutes.

On October 3, 2017, the federal magistrate judge made a report and recommendation. He found that there was probable cause for the initial stop by Trooper Strickland, but there was no reasonable suspicion for the continued detention after completion of computer checks and other tasks necessary for the traffic stop. The magistrate judge recommended that the motion to suppress be granted.

The magistrate judge stated that the government argued that reasonable suspicion for the continued detention existed based upon the totality of the following facts: (1) the car was registered to a third party; (2) the interior of the car was clean and void of personal effects and luggage; (3) Bell-Brayboy appeared nervous; (4) Bell-Brayboy answered a phone call from a friend whose name was not saved in his phone; (5) Trooper Strickland was unable to confirm that Bell-Brayboy was on the current roster

8

for the University of Alabama's football team; (6) Bell-Brayboy's stated itinerary was inconsistent with information provided by the ALPR system; and (7) Bell-Brayboy was not taking the most direct route from Houston to Tuscaloosa. The magistrate judge then evaluated these factors "independently and collectively."

The magistrate judge noted that, even though registry of a car to a third party might be a factor in establishing probable cause, Trooper Strickland never asked Bell-Brayboy for his sister's name to determine if it matched the name on the registration. The magistrate judge gave no weight to the third-party vehicle registration.

The magistrate judge also found that the fact that the car was very clean did not work to establish reasonable suspicion of drug activity stating that, "Many people keep clean cars." The magistrate judge noted that Trooper Strickland did not ask Bell-Brayboy about his lack of luggage. Then the magistrate judge concluded, "But even if there were no luggage in the trunk, that circumstance would be entitled to very little weight."

The magistrate judge next discounted Trooper Strickland's observation that Bell-Brayboy was nervous during the traffic stop. The magistrate judge viewed the dash-camera video and did not observe any excess nervousness "beyond that normally associated with an uninvited encounter with a state trooper on the side of a busy highway."

The magistrate judge discounted Trooper Strickland's testimony that it was "odd" that Bell-Brayboy took a call from a "friend" when the screen on the phone did not show an existing contact. The magistrate judge opined that people often get new telephones and have to re-enter contact information. According to the magistrate judge, "It may be that the fact was

unusual or even odd, like a person wearing mismatched socks, but Trooper Strickland did not explain how the fact was suggestive of criminal activity."

The magistrate judge found that Bell-Brayboy's statements about playing football for Alabama were "nothing more than youthful aggrandizement" and "puffery" aimed at avoiding a traffic ticket, "but did not do much to create reasonable suspicion of criminal activity."

The magistrate judge noted that Trooper Strickland never asked Bell-Brayboy about the fact that the car was seen in Lake Charles on the ALPR system the day before the traffic stop. The magistrate judge speculated that Bell-Brayboy may have left Houston on Monday and travelled to a casino in Lake Charles.

The magistrate judge was also swayed by the fact that Trooper Strickland did not ask Bell-Brayboy why he was not taking the most direct route from Houston to Tuscaloosa, concluding that "a driver's apparent choice of a less direct route is simply not very indicative of drug trafficking or other criminal activity."

According to the magistrate judge, Trooper Strickland thought that Bell-Brayboy was suspicious, but could not articulate what crime may have been committed or provide specific facts for why he suspected the driver. The magistrate judge stated that Trooper Strickland "merely had an unexplained hunch that something was afoot" and concluded that an officer must have more than a "mere hunch" that a person stopped is engaged in illegal activity if he wishes to lawfully detain him beyond the time reasonably necessary to handle the traffic offense. The magistrate judge noted that the traffic stop was completed in 14 minutes, but Bell-Brayboy was detained another 20 to 22 minutes before the drug dog arrived.

10

Accordingly, the magistrate judge found that the additional detention was unconstitutional and the motion to suppress should be granted.

On November 3, 2017, the federal district court judge adopted the magistrate judge's report and recommendation, granted the motion to suppress, and ordered that all "evidence recovered as a result of an unconstitutional search and seizure, including Defendant's incriminating statements" would be suppressed. This ended Bell-Brayboy's prosecution in federal court.

On December 6, 2017, based upon the same incident, Bell-Brayboy was charged in state court with one count of possession with intent to distribute more than 400 grams of cocaine and possession with intent to distribute heroin.[3] Just as he did in federal court, Bell-Brayboy filed a motion to suppress the evidence and statements, claiming there was no probable cause for the traffic stop and the officer unconstitutionally extended the traffic stop so that a K-9 unit could search the vehicle. Bell-Brayboy requested that the motion be granted and that all evidence following his traffic stop be declared inadmissible.

Even though somewhat repetitive of the facts stated above, it is important to recite the additional evidence and testimony presented at the state court motion to suppress hearing in order to illustrate the differences. The transcript of the federal motion to suppress hearing was admitted into evidence, along with Trooper Strickland's dash-camera video of the traffic stop. Trooper Strickland's curriculum vitae ("CV") was introduced. This

---

[3] The prosecution of Bell-Brayboy in state court for the same criminal activity after the dismissal of charges in federal court does not violate double jeopardy due to the dual-sovereignty doctrine. That rule provides that a crime under one sovereign's laws is not the same offense as a crime under the laws of another sovereign. *See Gamble v. United States*, ___ U.S.___, 139 S. Ct. 1960, 204 L. Ed. 2d 322 (2019).

evidence had not been used in the proceedings before the federal magistrate. The CV reflects that Trooper Strickland received a B.A. degree in criminal justice from Northwestern State University in 2004. He then worked for the Many Police Department and the DeSoto Parish Sheriff's Office before becoming employed by the Louisiana State Police in 2007. He had attended numerous law enforcement training sessions and had been a Team Leader for the Criminal Patrols Unit since 2014. During his tenure as Team Leader, Trooper Strickland had recovered a large amount of narcotics and money, numerous vehicles and weapons, and had recovered some people who were being trafficked.

At the hearing, Trooper Strickland's testimony was much more detailed than it had been before the federal magistrate. He explained his training and testified that he had attended a week-long drug interdiction course in Michigan called the Drug Interdiction Assistant Program. He was currently working on a four-man team, which included a K-9, looking for traveling criminals on I-20 that "travel across our state every day." He stated that there are narcotics trails from Mexico through hub cities in the United States, such as McAllen, Houston, and Dallas, Texas, and Atlanta, Georgia, all the way up the east coast. The normal procedure is that drugs are transported eastbound and money is transported westbound.

On the evening of February 21, 2017, Trooper Strickland was sitting on the shoulder of I-20 in Webster Parish watching eastbound traffic. He observed the 2005 Toyota Solara, driven by Bell-Brayboy, traveling in the right lane at the speed limit of 70 mph. When Bell-Brayboy saw Trooper Strickland, he slowed to 65 mph, and this caught Trooper Strickland's attention. Trooper Strickland said that he looks for driver reactions when

12

they see a police vehicle. He testified that, normally, people don't slow down that much when they are going the speed limit.

Trooper Strickland began following the vehicle, which passed two or three commercial vehicles, and then pulled back into the right lane, crossing the fog line, a violation of La. R.S. 32:79. Trooper Strickland pulled the vehicle over for the traffic violation. The vehicle had a Georgia license plate. Trooper Strickland ran a computer check on the license plate and determined that the vehicle was not stolen, but it was registered to a woman in Georgia. During the course of their conversation, Bell-Brayboy told Trooper Strickland that the car belonged to his sister.

According to Trooper Strickland, Bell-Brayboy did not look like he was doing interstate travel in the vehicle. The vehicle was very clean with no personal effects from the driver or the owner, and the car appeared to be freshly vacuumed. There was only a bag of snacks in the car and a University of Alabama backpack in the back seat. There was no luggage or other effects in the interior of the car. Trooper Strickland said the vehicle looked like a rental car with no personal items, such as loose change, pens, or paperwork.

The nature of his conversation with Bell-Brayboy raised Trooper Strickland's suspicions. He said that Bell-Brayboy was nervous and choked on his answers when initially questioned. Bell-Brayboy was holding a cellphone while talking to Trooper Strickland and was staring at a blank screen. He never really made eye contact and appeared to be waiting on a phone call. Trooper Strickland stated that, in his many years in law enforcement, he has made thousands of traffic stops and usually people make eye contact. Trooper Strickland saw this as a sign of nervousness.

13

During the course of his conversation with Trooper Strickland, Bell-Brayboy's cellphone rang. Bell-Brayboy said that he was letting a friend know where he was and that he was "okay." Trooper Strickland noted that the call appeared on the cellphone screen with only a telephone number and not the name of the "friend" that would normally be in the contacts list. The trooper said it would have been normal if Bell-Brayboy had been talking on the phone. Instead of having made a phone call, the defendant was focusing on a blank screen, expecting to receive a call. When Bell-Brayboy received the call, he tried to answer it. Trooper Strickland asked him not to answer and to continue talking with him. Trooper Strickland testified that drug traffickers frequently travel in pairs, with one car transporting the narcotics and another car traveling a mile or so away to keep an eye on the drugs. The driver of the vehicle transporting the drugs is usually required to check in regularly. Trooper Strickland concluded that the other vehicle called Bell-Brayboy when the traffic stop was observed. Trooper Strickland testified that, in some instances, they are able to apprehend the drivers of both vehicles.

Bell-Brayboy told Trooper Strickland that he played football for the University of Alabama and had traveled to Houston on Friday for training. The traffic stop occurred on Tuesday night. Trooper Strickland thought Bell-Brayboy would have had more luggage for a multi-day training trip. On cross-examination, Trooper Strickland said he had no idea if Bell-Brayboy had luggage in the trunk, but, as it turned out, there was no luggage.

Trooper Strickland felt that Bell-Brayboy was being deceptive. He returned to his vehicle and investigated whether Bell-Brayboy was on the

14

University of Alabama football team.  He could not find his name on the current roster of players, but did find his name on a list for a couple of years in the past, possibly on a practice team.  Trooper Strickland also found it odd that Bell-Brayboy would go to Houston for training because there would have been plenty of trainers in Alabama.  The officer was also aware that Houston is a known hub for drug activity.

Trooper Strickland noted that the quickest route from Houston to Tuscaloosa was on I-10 rather than I-20.  However, he was aware that drug traffickers frequently avoid I-10 because it is more heavily patrolled by law enforcement and interdiction teams.  Trooper Strickland ran Bell-Brayboy's license plate number on the ALPR system.  This inquiry showed that the car was on I-10 in Gulfport, Mississippi, at 4:05 a.m. on Monday morning, headed west.  The car was also seen heading west on I-12 in Hammond, Louisiana, I-10 in Lafayette, Louisiana, and I-10 in Lake Charles, Louisiana, which was the location of the last camera in the system.  This information, indicating a turnaround trip for the car, along with other factors testified to by the officer, led Trooper Strickland to be suspicious that Bell-Brayboy was transporting narcotics.  In accordance with standard procedure, the officer called for backup.  When Troopers Peart and Titus arrived, Bell-Brayboy was asked for consent to search the vehicle.  He refused to give consent, so Trooper Strickland called for the K-9 unit.

The K-9 unit from the Minden Police Department arrived within 20 to 22 minutes of the call.  The drug dog performed an open-air sniff around the car and alerted on both rear quarter panels.  The car was searched, leading to the discovery of large amounts of cocaine and heroin, and Bell-Brayboy was arrested.

15

The defendant did not testify at the hearing. The trial court took the matter under advisement in order to review the evidence. On October 16, 2018, the trial court issued a lengthy written opinion and denied the motion to suppress.[4] The trial court outlined the facts that were adduced at the hearing. The trial court found that Trooper Strickland had probable cause to stop Bell-Brayboy for improper lane usage and had reasonable suspicion that Bell-Brayboy had committed a crime or was about to commit a crime. The trial court noted that reasonable suspicion requires a weighing of the totality of the circumstances and Trooper Strickland acted in good faith and reasonably concluded, based upon all the factors set forth in his testimony, that Bell-Brayboy was involved in criminal activity. The obvious next step was to request a K-9 unit to conduct a roadside open-air sniff. The trial court found that the time it took for the K-9 unit to arrive at the scene was not unreasonable, based upon the location of the traffic stop. Accordingly, the trial court denied the motion to suppress the evidence.

On June 17, 2019, Bell-Brayboy entered pleas of guilty to the charges against him, reserving his right to appeal the denial of the motion to suppress the evidence, pursuant to *State v. Crosby*, *supra*.

## MOTION TO SUPPRESS

Bell-Brayboy appealed the trial court's denial of his motion to suppress. In his single assignment of error, he states:

---

[4] The original opinion in this case recites only one paragraph from the opinion. We cannot help but note that the well-reasoned, thorough, and cogent opinion issued by the trial court contains 60 footnotes, which extensively reference the evidence, the parties' briefs, applicable statutes, and federal and state jurisprudence.

There were no reasonable, articulable grounds for arresting Brandon Bell-Brayboy when he was seized illegally for 22 minutes before the initial free-air dog sniff.[5]

He claims in his brief that Trooper Strickland did not have sufficient information to justify the 22-minute detention and that he "cherry-picked" facts to support his "hunch" that criminal activity was afoot. Bell-Brayboy contends that, because he was seized illegally before the free-air dog sniff, the drugs recovered should be suppressed. These arguments are without merit.

## Legal Principles

The state bears the burden of proving the admissibility of the evidence seized without a warrant when the legality of a search or seizure is placed at issue by a motion to suppress evidence. La. C. Cr. P. art. 703(D). The trial court's ruling on a motion to suppress is reviewed under the manifest error standard in regard to factual determinations, as well as credibility and weight determinations, while applying a *de novo* review to findings of law. *State v. Prince*, 50,548 (La. App. 2 Cir. 4/13/16), 195 So. 3d 6; *State v. Delvalle*, 46,563 (La. App. 2 Cir. 9/21/11), 73 So. 3d 1026. A trial court's denial of a motion to suppress is afforded great weight and will not be set aside unless a preponderance of the evidence clearly favors suppression. *State v. Manning* ("*Manning II*")*, 51,450 (La. App. 2 Cir. 8/9/17), 244 So. 3d 600, *writ denied*, 2017-1575 (La. 5/18/18), 242 So. 3d 575; *State v. Wells*, 2008-2262 (La. 7/6/10), 45 So. 3d 577. The entire record is reviewable for determining the correctness of a ruling on a motion to suppress. *State v. Pena*, 43,321 (La. App. 2 Cir. 7/30/08), 988 So. 2d 841.

---

[5] We note that Bell-Brayboy was not under arrest while awaiting the arrival of the drug dog. He was merely detained.

17

The right of every person to be secure in his person, house, papers, and effects against unreasonable searches and seizures is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the Louisiana Constitution. *State v. Freeman*, 44,980 (La. App. 2 Cir. 1/27/10), 33 So. 3d 222, *writ denied*, 2010-0535 (La. 10/1/10), 45 So. 3d 1094. The authority and limits of the Fourth Amendment apply to investigative stops of vehicles. *United States v. Sharpe*, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985). The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment. *State v. Burney*, 47,056 (La. App. 2 Cir. 5/23/12), 92 So. 3d 1184, *writ denied*, 2012-1469 (La. 1/11/13), 106 So. 3d 548.

The standard for evaluating a challenge to a routine warrantless stop for violating traffic laws is the two-step formulation articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). *See State v. Pena*, *supra*. The court must determine whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Shabazz*, *supra*; *State v. Pena*, *supra*.

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred or is about to occur, before stopping the vehicle. *United States v. Sharpe*, *supra*; *State v. Sims*, 426 So. 2d 148 (La. 1983). To satisfy the reasonableness requirement of the Fourth Amendment, police officers conducting an investigatory stop must have a reasonable suspicion supported by articulable facts that criminal activity "may be afoot." *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989); *State*

18

*v. Morgan*, 2009-2352 (La. 3/15/11), 59 So. 3d 403; *State v. Ardison*, 52,739 (La. App. 2 Cir. 6/26/19), 277 So. 3d 883.

As a general matter, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *See Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *State v. Waters*, 2000-0356 (La. 3/12/01), 780 So. 2d 1053. The standard is a purely objective one that does not take into account the subjective beliefs or expectations of the detaining officer. *Whren v. United States*, *supra*; *State v. Waters*, *supra*. Although they may serve, and may often appear intended to serve, as the prelude to the investigation of much more serious offenses, even relatively minor traffic violations provide an objective basis for lawfully detaining the vehicle and its occupants. *State v. Waters*, *supra*.

In Louisiana, as in other jurisdictions, a car which partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right-hand shoulder of the road therefore provides the police with probable cause to believe that a traffic violation for improper lane use has occurred. *State v. Waters*, *supra*; *State v. Prince*, *supra*.

La. C. Cr. P. art 215.1(D) provides, in part:

> D. During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, *absent reasonable suspicion of additional criminal activity*[.] [Emphasis supplied.]

In stopping a vehicle on reasonable suspicion, an officer has the right to conduct a routine license and registration check and may engage in conversation with the driver and any passenger while doing so. *State v.*

19

*Manning* ("*Manning I*"), 50,591 (La. App. 2 Cir. 5/18/16), 196 So. 3d 626; *State v. Lee*, 46,742 (La. App. 2 Cir. 12/14/11), 79 So. 3d 1278; *State v. Pena*, *supra*. In order to further detain a suspect, however, the officer must have articulable facts giving rise to a reasonable suspicion of some separate illegal activity that would justify further detention of the suspect. In making that determination, "the totality of the circumstances — the whole picture — must be taken into account." *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). *See also United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *State v. Kalie*, 96-2650 (La. 9/19/97), 699 So. 2d 879; *Manning II*, *supra*; *State v. Arnold*, 34,194 (La. App. 2 Cir. 12/6/00), 779 So. 2d 840.

Based on that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. The circumstances must be judged by an objective standard: would the facts available to the officer at the moment of seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? *State v. Kalie*, *supra*; *Manning II*, *supra*.

Regarding reasonable suspicion, the Supreme Court in *Terry* stated that, in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. The Supreme Court further explained that officers are allowed to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person." *United States v. Arvizu*, 534 U.S.

20

266, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); *State v. Morgan*, *supra*; *State v. Johnson*, 2001-2081 (La. 4/26/02), 815 So. 2d 809.

A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. See *State v. Miller*, 2000-1657 (La. 10/26/01), 798 So. 2d 947, and cases cited therein. Much as a "bright line" rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria. See *United States v. Sharpe*, *supra*, and cases cited therein. *See also Manning I*, *supra*; *State v. Prince*, *supra*. Further, there is no bright line rule for when a detention lasts too long and each instance must be assessed in view of the surrounding circumstances. *State v. Burney*, *supra*.

If a police officer has a specific suspicion of criminal activity, he may further detain the individual or the property while he diligently pursues a means of investigation likely to quickly confirm or dispel the particular suspicion. *United States v. Sharpe*, *supra*; *State v. Turner*, 13-0180 (La. 3/1/13), 108 So. 3d 753; *State v. Williams*, 47,750 (La. App. 2 Cir. 4/10/13), 112 So. 3d 1022, *writ denied*, 2013-1394 (La. 12/2/13), 126 So. 3d 502; *State v. Burney*, *supra*; *State v. Lee*, *supra*.

The use of a drug dog as a means of investigation is one way to confirm or dispel the officer's reasonable suspicion. A dog sniff of the vehicle's exterior surfaces is not a "search" under the meaning of the Fourth Amendment. *United States v. Place*, *supra*; *State v. Kalie*, *supra*; *Manning I*, *supra*; *State v. Smith*, 49,356 (La. App. 2 Cir. 11/19/14), 152 So. 3d 218, *writ denied*, 2014-2695 (La. 10/23/15), 179 So. 3d 597. *See also Illinois v.*

21

*Caballes*, 543 U.S. 405, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). However, at the moment the dog alerts to the interior of the vehicle, officers have probable cause to search a vehicle without first obtaining a warrant. *State v. Prince*, *supra*.

## Discussion

Bell-Brayboy originally contended in his motions to suppress in federal court and in the state court that the traffic stop was a mere pretext and illegal. Both courts rejected that argument and found there was probable cause for the initial stop. On appeal, Bell-Brayboy does not object to the trial court's finding on this issue. Rather, he essentially contends that there was no reasonable suspicion to detain him after the traffic stop in order for the drug dog to arrive and perform an open-air sniff of his vehicle.

The testimony and evidence adduced at the motion to suppress hearing under review in this case was more extensive than that presented in the federal court and established that Trooper Strickland had reasonable suspicion that Bell-Brayboy was trafficking in illegal narcotics. This reasonable suspicion justified extending the stop for further investigation.

First, Trooper Strickland outlined his educational background in criminal justice and his extensive experience and training in detecting drug trafficking. He also explained the significance of drug hub cities, such as Houston, and the manner in which drugs and money are transported east and west. He explained how drug trafficking works and the various tools and methods that are employed. His experience and training allowed him to make inferences from and deductions about the cumulative information in this case that might have eluded an untrained person.

After stopping Bell-Brayboy for a traffic violation, Trooper Strickland noted that the vehicle was registered to a woman in Georgia. When he approached Bell-Brayboy, it was obvious that the vehicle was not his. The trooper also noted the clean state of the car, with no personal effects from the owner or the driver. It appeared to have been recently vacuumed, contributing to the trooper's conclusion that the vehicle looked like a rental car. Bell-Brayboy said that the car was his sister's and, even though Trooper Strickland never asked for a name to verify that information, many other factors quickly developed which showed that Bell-Brayboy was being deceptive, leading to the formation of reasonable suspicion that he was engaged in criminal activity.

These factors included the defendant's nervousness and lack of eye contact when he was initially stopped. Although the magistrate judge reviewed the video of the traffic stop and did not observe any excessive nervousness, we also reviewed the video and note that, in the initial exchange between Trooper Strickland and Bell-Brayboy, the defendant was still in the vehicle. He cannot be seen and his answers cannot be heard due to traffic noise from the highway. In the present motion to suppress, the trial court found Trooper Strickland to be credible in his assessment that Bell-Brayboy was nervous when initially stopped. There is no evidence in the record to dispute that finding.

An additional factor supporting reasonable suspicion was Bell-Brayboy's behavior concerning his cellphone. Trooper Strickland testified that Bell-Brayboy was holding his cellphone, staring at a blank screen, immediately after the stop. He said that he was letting a "friend" know where he was. Trooper Strickland noted that Bell-Brayboy was not making

23

a phone call, but was waiting to receive one. When the phone rang shortly after the traffic stop, the trooper noticed that only a phone number appeared on the screen. The name of the "friend" was not in Bell-Brayboy's contact list on the phone. The magistrate judge found there were innocuous explanations for the fact that no name appeared on the screen and concluded that Trooper Strickland did not explain how that fact was indicative of drug activity. By contrast, at the present hearing in the state trial court, Trooper Strickland provided an explanation. He testified that drug traffickers frequently travel in pairs. One person transports the drugs and the other keeps an eye on the drugs. The person transporting the drugs is required to check in frequently. Trooper Strickland stated that, based upon his experience, he suspected that the person or persons accompanying Bell-Brayboy saw the traffic stop and called to see what was happening.

In oral argument on rehearing, defense counsel argued that it was significant that Trooper Strickland did not identify any passing car he suspected was the companion vehicle. We find that this fact was not significant given the circumstances of the traffic stop. It was made at night, in the rain, with heavy traffic passing on a busy interstate highway, and the trooper's attention was focused on Bell-Brayboy.

The next factor leading to the development of reasonable suspicion was the discovery that Bell-Brayboy was lying about playing for the University of Alabama, casting doubt on his story that he had been in Houston for training. Trooper Strickland investigated this story and found that Bell-Brayboy was not on the current roster of players.[6] The trooper

_____

[6] The fact that the defendant may have played on a practice team in the past did not support his story of currently playing on the team or seeking training.

observed that Bell-Brayboy did not have any luggage, as would be expected if his story was true. The trooper also found it significant that the defendant said he had gone to Houston, a known drug-hub city, for training, when there should have been plenty of trainers available at the University of Alabama.

Next, Trooper Strickland discovered that Bell-Brayboy's vehicle was not in Houston the day before, but was seen traveling all the way across south Louisiana, beginning in the early morning hours the day before the traffic stop. In federal court, Trooper Strickland testified only that the vehicle was observed in Lake Charles the day before. In the hearing on the present motion to suppress, Trooper Strickland testified that the vehicle was initially seen in Gulfport, Mississippi at 4:05 a.m. on Monday, the day before the traffic stop, heading west. The car was also seen heading west on I-12 in Hammond, Louisiana, on I-10 in Lafayette, and finally on I-10 in Lake Charles, where the last camera in the system is located. Even though Trooper Strickland did not question the defendant regarding this information, he found that these facts indicated that the vehicle was making a turnaround trip. This information also undermines the magistrate judge's speculation that Bell-Brayboy may have traveled from Houston to "a casino in Lake Charles" the day before the traffic stop.

Trooper Strickland found it significant that Bell-Brayboy, who claimed he was traveling from Houston to Tuscaloosa, was on I-20 rather that I-10, which is a more direct route. At the federal motion to suppress hearing, the magistrate judge found that choosing a less direct route was not indicative of drug activity. In the hearing in the present case, Trooper Strickland explained that drug traffickers try to avoid I-10 because it is more

25

heavily patrolled with interdiction teams than I-20. Therefore, the choice of a longer route avoiding I-10 was significant. Also, unlike his testimony in the federal court hearing, in this case, Trooper Strickland was unequivocal that he suspected Bell-Brayboy of drug trafficking.

None of the trooper's suspicions were shown to be incorrect. The defendant's story about being in Houston on a four- or five-day training trip was fabricated. The subsequent search of the trunk after the defendant was placed under arrest revealed that there was no luggage there. As shown on the video of the stop and eventual arrest, the defendant continued to be preoccupied with the cellphone. The phone contained numerous calls from the unidentified person Bell-Brayboy knew only as Pop. Had the trooper been incorrect about anything, the defense, of course, could have utilized this to impeach him. On the record before us there was simply no evidence to discredit Trooper Strickland's testimony. The trial court's decision to find his testimony credible is entitled to deference by this court.

Bell-Brayboy did not testify at the hearing on the motion to suppress to refute any of the testimony given by Trooper Strickland.[7]

In the present case, Trooper Strickland not only gave the court more information than was presented in the federal court, he also gave more detailed explanations of why those facts were significant to him and led him to have reasonable suspicion that Bell-Brayboy was engaged in drug trafficking. Trooper Strickland knew that Bell-Brayboy was lying about playing football for the University of Alabama and other factors indicated

---

[7] La. C. Cr. P. art.703(E)(1) provides, in part, that the defendant may testify in support of a motion to suppress without being subject to examination on other matters. The defendant's testimony cannot be used by the state except for the purpose of attacking the credibility of the defendant's testimony at the trial on the merits.

26

that Bell-Brayboy had not been in Houston for five days of training, as he claimed. The facts discussed above quickly developed during the traffic stop and, when viewed and evaluated by a trained law enforcement officer, led to the reasonable suspicion that Bell-Brayboy was transporting narcotics.

The defendant argues that, because Trooper Strickland did not question Bell-Brayboy about the third-party registration; his lack of luggage; why his name did not appear on the University of Alabama team; why the vehicle was seen early the day before, traveling west across the state of Louisiana; and why he was traveling on I-20 instead of I-10, the most direct route from Houston to Tuscaloosa, that the trooper did not diligently pursue a means of investigation likely to quickly dispel or confirm his suspicion. We are not persuaded by the defendant's argument that the trooper was required to question Bell-Brayboy about each factor of his story that did not add up after the officer had already developed reasonable suspicion that the defendant was engaged in criminal activity and knew that he was being untruthful. As discussed above, Trooper Strickland provided explanations of why those factors, coupled with his training and experience, gave him reasonable suspicion that Bell-Brayboy was transporting illegal drugs. The facts presented here show an ample basis for Trooper Strickland's reasonable suspicion, not an inchoate or unparticularized suspicion or hunch. He then chose to call a drug dog to do an open-air sniff. As set forth above, the use of a drug dog as a means of investigation is one way to confirm or dispel the officer's reasonable suspicion. This was the means of investigation Trooper Strickland diligently pursued to quickly confirm or dispel his suspicion, rather than engaging in pointless questioning of a person he knew was being deceptive.

27

Defense counsel argued before this court on rehearing that finding that Trooper Strickland developed reasonable suspicion of criminal activity without further questioning the defendant would necessarily result in giving officers free rein to abuse Fourth Amendment rights. We reject this argument. Reasonable suspicion will always be required for a detention and that standard was not breached here. Under the facts of this case, Trooper Strickland did not violate the defendant's constitutional rights in his choice of a means of investigation.

The original opinion found that that Trooper Strickland did not have reasonable suspicion and essentially echoed the reasoning of the magistrate judge without considering the additional testimony and evidence presented in this matter. That analysis was based on incomplete information and examined in isolation several factors which, in this case, combined to establish reasonable suspicion to detain Bell-Brayboy. The original opinion went to great lengths to posit "innocuous explanations" for the defendant's behavior and criticized Trooper Strickland. This approach is inappropriate and failed to consider the "totality of the circumstances," as the Supreme Court has frequently advised must be done. *United States v. Arvizu*, *supra*. The original opinion's approach was similar to that rejected in *Arvizu*, where a lower court evaluated separately each factor observed by an officer which he contended established reasonable suspicion to stop a vehicle. The lower court found each factor susceptible to an innocent explanation and entitled to "no weight." The Supreme Court in *Arvizu* observed that *Terry* "precludes this sort of divide-and-conquer analysis." The Louisiana Supreme Court has also cited *Arzivu* in finding that the assessment by a reviewing court of the cumulative information known to an officer or officers avoids a "divide-and-

28

conquer analysis" by which the whole becomes less than the sum of its parts because each circumstance examined individually may appear "readily susceptible to an innocent explanation." *State v. Johnson*, *supra*.

The original opinion in this case also relied upon *Rodriguez v. United States*, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), in finding that Bell-Brayboy's detention was illegal. *Rodriguez* is factually distinguishable from the present case. That case held that police may not routinely extend an otherwise completed traffic stop absent reasonable suspicion in order to conduct an open-air sniff by a drug dog. In *Rodriguez*, the defendant was stopped for veering onto the shoulder and then jerking the vehicle back onto the roadway. He was issued a warning ticket, the traffic stop was concluded, and there was no reasonable suspicion of any other criminal activity justifying continued detention. The officer asked for permission to run the drug dog around the car. Permission was refused, but the officer did so anyway. The dog alerted, leading to the discovery of illegal narcotics.

In *Rodriguez*, the traffic stop was completed and there was a total lack of reasonable suspicion of further criminal activity when the officer used the drug dog. By contrast, in the present case, factors began to develop immediately which quickly led to the development of reasonable suspicion that Bell-Brayboy was involved in drug trafficking. *Rodriguez* is inapplicable once reasonable suspicion is established. *Manning I*, *supra*.

The original opinion noted in dicta that, if Bell-Brayboy sought federal *habeas* relief in this matter, the federal court would be unlikely to countermand its decision that the search of the defendant's car was unconstitutional. If Bell-Brayboy applies for and is granted *habeas* review

from this decision, the federal court would not be reviewing its prior decision, but would be required to review the more extensive evidence and testimony adduced in the present case, the trial court ruling, and this ruling. Further, this argument was not raised below and is not before us on appeal.

We also find that the length of Bell-Brayboy's detention was not unreasonable.[8] In assessing the reasonableness of the duration of the investigative detention, the Supreme Court has focused on the diligence of the detaining officers. The Supreme Court said that a court making this assessment should take care to consider whether the police are acting in a swiftly developing situation and, in such cases, the court should not indulge in unrealistic second-guessing. *United States v. Sharpe*, *supra*. *See also Manning II*, *supra*; *State v. Prince*, *supra*; *State v. Burney*, *supra*.[9] In this case, Trooper Strickland promptly requested a drug dog approximately 14 minutes after the initial stop, and the dog arrived 22 minutes later. The total time from the initial stop until the drug dog alerted was 36 minutes.

Trooper Strickland had reasonable suspicion that Bell-Brayboy was involved in drug trafficking and he legally detained him while awaiting the drug dog to investigate that suspicion. Bell-Brayboy's Fourth Amendment rights were not violated. Therefore, the evidence seized from the car and the

---

[8] During oral argument on rehearing, defense counsel acknowledged that the length of time it took for the drug dog to arrive at the scene was not an issue and that the time was not unreasonable. However, since the original opinion of this case criticized the amount of time, we deem it necessary to address the issue.

[9] Although there is no bright-line rule for how long is too long for an investigatory detention, numerous courts in our state have considered this question. The following periods of detention similar to or greater than those in the present case have been found to be reasonable: *State v. Miller*, *supra*, 34 minutes; *State v. Turner*, *supra*, 60 minutes; *State v. Williams*, *supra*, 39 minutes; *State v. Burney*, *supra*, 70 minutes; *State v. Lee*, *supra*, 30-40 minutes; *State v. Lawrence*, 45,061 (La. App. 2 Cir. 3/3/10), 32 So. 3d 329, *writ denied*, 2010-0615 (La. 10/8/10), 46 So. 3d 1265, 30 minutes; *State v. Chinn*, 11-893 (La. App. 5 Cir. 4/24/12), 94 So. 3d 838, *writ denied*, 2012-1171 (La. 11/2/12), 99 So. 3d 663, 34 minutes.

statements made by Bell-Brayboy after his arrest are admissible. The trial court did not err in denying the defendant's motion to suppress.

**ERROR PATENT**

Our error patent review indicates that, at sentencing, the trial court failed to specify that the 15-year sentence for possession of 400 grams or more of cocaine be served without benefit of parole, probation, or suspension of sentence. La. R.S. 40:967(F)(1)(c), which was in effect at the time these offenses were committed, provided:[10]

F. Other penalties for possession.

(1) Except as otherwise authorized in this Part:

(c) Any person who knowingly or intentionally possesses four hundred grams or more of cocaine or of a mixture or substance containing a detectable amount of cocaine or of its analogues as provided in Schedule II(A)(4) of R.S. 40:964, shall be sentenced to serve a term of imprisonment at hard labor of not less than fifteen years, nor more than thirty years and to pay a fine of not less than two hundred fifty thousand dollars, nor more than six hundred thousand dollars.

La. R.S. 40:967(G) stated:

With respect to any person to whom the provisions of Subsection F are applicable, the adjudication of guilt or imposition of sentence shall not be suspended, deferred, or withheld, nor shall such person be eligible for probation or parole prior to serving the minimum sentences provided by Subsection F.

When the district court fails to order service of a sentence without benefits, but a determinative time period is statutorily mandated, the sentence is to automatically be served without benefits for the required time period. La. R.S. 15:301.1; *State v. Johnson*, 46,405 (La. App. 2 Cir. 8/10/11), 70 So. 3d 1097. Here, Bell-Brayboy was sentenced to serve 15

---

[10] La. R.S. 40:966(F) and (G) were repealed by La. Acts 2017, No. 281, § 3.

31

years at hard labor for La. R.S. 40:967(F)(1)(c), the minimum sentence; therefore this sentence is automatically required by law to be served without benefits. We also note that this does not increase the amount of time that Bell-Brayboy will be required to serve, because he was ordered to serve 15 years at hard labor, without benefits, for the charge of possession with intent to distribute heroin under the version of La. R.S. 40:966(A)(1) in effect at the time of the commission of these offenses.

We further note that, in his bill of information, Bell-Brayboy was charged with violation of La. R.S. 40:967(F)(1)(c), which prohibits possession of 400 grams or more of cocaine. The words "with intent to distribute" is not contained in the statute. The possession of such a large amount of cocaine is indicative of an intent to distribute and the defendant was fully informed of the charge against him and the penalty. The inclusion of the additional language constitutes harmless error.

## CONCLUSION

On rehearing, we affirm the ruling of the trial court, denying the motion to suppress filed by the defendant, Brandon Bell-Brayboy.

**AFFIRMED.**

32

**STEPHENS, J., dissents.**

I respectfully dissent, and would grant the motion to suppress for those reasons set forth in our original opinion, as well as the following.

While the interdiction of drugs in our country is of utmost importance, it cannot supersede the sanctity of our constitutional rights and freedoms. The right to be free of unwarranted searches and seizures is one such right that routinely conflicts with the enforcement of laws regarding drugs and drug trafficking. But, just as the right to remain silent often precludes the extraction of a confession, the preservation of that right is essential to our democracy.

In this case, Officer Strickland had a "hunch" that the Defendant was participating in an illegal activity. However, as accurate as that intuition may have been, it cannot and does not serve as grounds to suspend one's constitutional rights. Likewise, hunches cannot become the grounds for contriving suspicious activities where none actually exist.

Frankly, the most clearly suspicious activity engaged in by the Defendant was the assertion of his constitutional right to refuse the search. It is quite ironic that asserting your constitutional right will cause you to forfeit that right. I cannot and will not condone the legal premise that asserting one's constitutional rights somehow serves as grounds to deprive a person of that right.

I am thoroughly convinced that the Federal Court, as well as the original panel, was correct in its exclusion of the evidence. I would grant the motion to suppress.